Norman P. Van Valkenburgh and Elsie M. Van Valkenburgh v. Commissioner.
Van Valkenburgh v. Commissioner
Docket No. 2933-62.
United States Tax Court
T.C. Memo 1967-162; 1967 Tax Ct. Memo LEXIS 100; 26 T.C.M. (CCH) 753; T.C.M. (RIA) 67162; August 3, 1967
Ernest R. Mortenson, 961 E. Green St., Pasadena, Calif., for the petitioners. James A. Thomas, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following income tax deficiencies and additions to tax against the petitioners: Additions to Tax
Sec. 293(b)
Sec. 6653(b)
Sec. 294(d)(2)
Year
Deficiency
IRC 1939
IRC 1954
IRC 1939
1950
$ 2,094.70
$1,047.35
1951
3,436.60
3,651.07
$ 206.19
1952
11,879.73
1,380.73
1,228.31
1953
907.64
977.14
1954
none
none
1955
158,145.31
$79,072.66
1956
59,424.00
29,712.00
Certain concessions have been stipulated or otherwise made by the parties. The issues remaining for decision are: 1. Whether petitioners fraudulently omitted items of gross receipts from their income tax returns for the years 1950 through 1956 with an intent to evade their taxes. 2. Whether items of gross receipts omitted by petitioners *104 from their income tax returns for the years 1950 through 1956 were expended for business purposes. 3. Whether petitioners fraudulently deducted personal expenses as business expenses on their income tax returns for the years 1954 through 1956. 4. Whether petitioners are entitled to have their taxable net income determined by use of the completed contract method of accounting for the years 1955 and 1956. 5. Whether petitioners correctly reported retentions under construction contracts in the years 1955 and 1956. 6. Whether certain payments made by petitioners in the years 1954 through 1956 were for the rental or purchase of equipment and, if the amounts were for the purchase of equipment, whether respondent's determination of allowable depreciation is correct. 7. Whether petitioners sustained a deductible business loss of $32,905.30 in the year 1955 in connection with a bid on grain storage facilities in Pakistan. 8. Whether petitioners are entitled to a business bad debt deduction of $27,016.97 in the year 1955 in connection with an advance made to John Murdock. 9. Whether petitioners are entitled to a deduction of $7,900 in the year 1956 claimed as a bonus paid to Carl *105 Staiger. 10. Whether petitioners are entitled to a nonbusiness bad debt of $7,966.55 in 1955 on a loan made to Hughes Blades, Inc., or a loss of $9,900 on the purported sale of Hughes Blades stock in that year. 11. Whether petitioners are entitled to a net operating loss carryback from 1954 to 1952. 12. Whether petitioners are liable for the additions to tax for the years 1951 and 1952 under section 294(d)(2), Internal Revenue Code of 1939. 13. Whether assessment of deficiencies for the years 1950 through 1954 is barred by the statute of limitations. Findings of Fact Some of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Norman P. Van Valkenburgh (herein called petitioner) and Elsie M. Van Valkenburgh are husband and wife whose legal residence was Pasadena, California, at the time the petition was filed in this proceeding. They filed their joint Federal income tax returns for the years 1950 through 1956 with the district director of internal revenue at Los Angeles, California. Elsie M. Van Valkenburgh is involved in this proceeding only because she filed joint income *106 tax returns with petitioner. Petitioner was born at Deer Creek, Oklahoma, in 1900. He attended high school in Deer Creek and then attended Oklahoma A & M College for 2 years. After farming for a couple of years in Oklahoma, the petitioner moved to California in 1925 and went into the dump truck business. In 1931, the petitioner branched out into pipeline painting which he continued along with the dump truck business until 1935. Then he formed a partnership with a Mr. Williams and entered the pipeline construction business. The partnership was dissolved in 1942 with the petitioner continuing in the pipeline construction business and operating as a sole proprietorship until 1962. During the period from 1950 to 1956, the sole proprietorship was operated under the name of the N. P. Van Valkenburgh Company. For the year ended December 31, 1951, the financial statements of the N. P. Van Valkenburgh Company show a net worth of $363,661.01. The financial statements for the N. P. Van Valkenburgh Company for the year ended December 31, 1956, show a net worth of $374,065. Omitted Income For the taxable years 1950 through 1956, certain amounts were paid to the N. P. Van Valkenburgh Company *107 by its customers which were not recorded on the books and records of the company nor reported by petitioners on any Federal income tax return. The respective totals of unreported taxable income in each year are as follows: Year
Amount
1950
$ 4,452.35
1951
5,454.90
1952
2,275.08
1953
401.00
1954
7,516.80
1955
16,713.14
1956
5,084.49 This unreported taxable income consisted primarily of receipts from the rental of equipment, installation of sewer connections at South Laguna, sale of pipe, and the installation of pipe. With the exception of the sewer connections, unreported receipts are itemized below by taxable year, amount, purpose of payment and disposition of payment: 1950
Amount
Payment For
Disposition
$ 2,041.01
Rental of Equip.
Cashed by N. P. at S.B.M. a1
1,228.00
Rental of Equip.
Deposited in bank by Mrs.
N. P. Checks deposited in bank by Mrs. N. P. were endorsed by N. P.
a2
528.80
Rental of Equip.
Cashed by N. P. at S.B.M.
204.54
Sale of Pipe
Cashed by N. P. at S.B.M.
450.00
Rental of Equip.
Deposited in bank by Mrs.
N. P.
$ 4,452.35
1951
$ 1,872.00
Rental of Equip.
Cashed by N. P. at S.B.M.
192.00
Rental of Equip.
Cashed by N. P. at S.B.M.
450.00
Rental of Equip.
Cashed by N. P. at S.B.M.
180.00
Rental of Equip.
Cashed by N. P. at S.B.M.
2,310.90
Credit Memorandum
Cashed by N. P. at S.B.M.
450.00
Rental of Equip.
Cashed by N. P.
$ 5,454.90
1952
$ 122.65
Rental of Equip.
Cashed by N. P. at S.B.M.
799.56
Credit Memorandum
Cashed by N. P. at S.B.M.
1,352.87
Sale of pipe
Cashed by N. P. at S.B.M.
$ 2,275.08
1953
$ 401.00
Credit Memorandum
Cashed by N. P. at S.B.M.
1954
$ 578.00
Rental of Equip.
Cashed by N. P. at S.B.M.
2,196.00
Installation of pipe
Cashed by N. P. at S.B.M.
244.00
Contract retention
Cashed by N. P. at S.B.M.
4,498.80
Sewer connections at So. Laguna
$ 7,516.80
1955
$ 343.99
Payment of credit balance
Cashed by N. P. at S.B.M.
2,610.00
Installation of water main
Cashed by N. P. at S.B.M.
486.97
Credit-mdse returns
Cashed by N. P. at S.B.M.
373.64
Credit-mdse returns
Cashed by N. P.
1,386.60
Rental of Equip.
N. P. invested in Hughes
Blades, Inc.
11,511.94
Sewer connections at So. Laguna
$16,713.14
1956
$ 1,050.00
Rental of Equip.
Cashed by N. P. at S.B.M.
525.00
Rental of Equip.
Cashed by N. P. at S.B.M.
877.39
Replacement of broken pipe
Cashed by N. P. at S.B.M.
832.20
Replacement of broken pipe
Cashed by N. P. at S.B.M.
200.00
Installation of 3 hydrants
Cashed by N. P. at S.B.M.
1,599.90
Sale of pipe
Cashed by N. P.
$ 5,084.49
*108 The unreported receipts from sewer connections at South Laguna in 1954 and 1955 arose out of the following transaction: During the years 1954 and 1955, the N. P. Van Valkenburgh Company constructed a sewage collection system in South Laguna, California, for the Laguna Beach County Water District. During approximately the same period the N. P. Van Valkenburgh Company was employed by many of the property owners of South Laguna to connect their properties to the main sewer line being constructed by the company for the Water District. Sewer connection receipts totaling $4,498 in 1954 and $11,511.94 in 1955 were not reported. These unreported receipts are itemized by amount and disposition as follows: 1954
Amount
Disposition of Check
$ 179.00
523.00
Cashed by John Van Valkenburgh
501.00
Cashed by John Van Valkenburgh
490.00
Cashed by John Van Valkenburgh
362.00
Cashed by John Van Valkenburgh
27.50
Cashed by N. P. at S.B.M.
100.00
Cashed by N. P. at S.B.M.
500.00
Cashed by John Van Valkenburgh
270.00
Cashed by John Van Valkenburgh
169.00
Cashed by John Van Valkenburgh
373.00
599.50
Cashed by John Van Valkenburgh
120.00
Cashed by John Van Valkenburgh
4.80
Cashed by John Van Valkenburgh
12.00
Cashed by John Van Valkenburgh
148.00
120.00
$ 4,498.80
1955
$ 135.00
Endorsed by N. P. to J. R. a2
270.00
Cashed by N. P. at S.B.M. a1
445.00
Cashed by N. P. at S.B.M. a1
235.00
60.00
Cashed by N. P. at S.B.M.
600.00
Cashed by N. P. at S.B.M.
240.00
Cashed by N. P. at S.B.M.
778.00
Deposited by N. P. in his personal
bank account
10.00
Cashed by John
40.00
Cashed by N. P. at S.B.M.
20.00
Cashed by N. P. at S.B.M.
8.00
Cashed by N. P. at S.B.M.
90.00
260.00
54.00
Cashed by N. P.
311.48
210.00
615.00
Deposited by N. P. in his personal
bank account
176.48
Cashed by N. P.
54.00
Cashed by John
20.00
Cashed by N. P. at S.B.M.
20.00
Endorsed by N. P. to Ralph I.
Brooks
140.00
Cashed by N. P. at S.B.M.
170.00
80.00
140.00
350.00
140.00
1,200.00
Cashed by N. P.
450.00
Endorsed by N. P. to J. R. **
291.00
Cashed by N. P. to S.B.M.
475.00
235.00
Endorsed by N. P. to J. R.
940.00
Endorsed by N. P. to J. R.
410.00
Endorsed by N. P. to J. R.
20.00
Endorsed by N. P. to Ralph I.
Brooks
411.48
Endorsed by N. P. to J. R.
75.00
Cashed by N. P. at S.B.M.
$ 65.00
Cashed by N. P. at S.B.M.
650.00
Endorsed by N. P. to J. R.
50.00
Endorsed by N. P. to San Marino
Escrow Company
310.00
Cashed by N. P. at S.B.M.
20.00
Cashed by N. P. at S.B.M.
237.50
Endorsed by N. P. to J. R.
$11,511.94
*109 From 1950 through 1956 the N. P. Van Valkenburgh Company employed 4 or 5 employees at its general office. The employees consisted of two job estimators, a bookkeeper and one or two girls who did the secretarial work and assisted the bookkeeper. From approximately 1937 to July 1956, the petitioner employed Carl Staiger as his bookkeeper. Staiger was replaced by Albert Durham who served as bookkeeper until June 7, 1957. Shirley Val Dere was employed as a secretary and assistant to the bookkeeper from 1951 until July 1957. Jean Kennedy (formerly Jean Nelson) was employed as an assistant to the bookkeeper on two different occasions: first, in 1953, and then again from July 1955 to November 1956. During the period from 1950 to 1956 the N. P. Van Valkenburgh Company *110 generally used the following billing procedure: Multicopies of invoices were prepared and forwarded to the customer with at least one copy being retained by the N. P. Van Valkenburgh Company. An appropriate entry was made in the sales journal. Upon receipt of payment, accounts receivable was posted. Although all of the unreported receipts were invoiced by the N. P. Van Valkenburgh Company, none of these amounts were recorded on the books and records of the company. Petitioner deliberately caused the unreported receipts to be omitted from the books and records of the N. P. Van Valkenburgh Company. Some of the receipts were not entered on the books and records pursuant to instructions from petitioner to Staiger. On some occasions the petitioner instructed Staiger that equipment rental transactions were not to be entered on the company books and that the receipts from such transactions were to be given to petitioner. The remaining unreported receipts were not entered on the books because the petitioner destroyed the retained copies of the invoices before the transactions were entered on the books and took the payments before they were posted. When interviewed by the examining agents *111 of the Internal Revenue Service in February 1958, the petitioner stated that he had seldom, if ever, rented equipment. Petitioner received no more than $800 a year from the rental of equipment in the 6 years preceding 1958. Personal Expenses Deducted as Business Expenses For the taxable years 1954 through 1956, the following amounts were claimed as business expenses by petitioners on their Federal income tax returns: Year
Amount
1954
$ 4,381.48
1955
66,719.77
1956
22,101.67 Such amounts were entered on the books and records of the N. P. Van Valkenburgh Company as business expenses. The personal expenses deducted by petitioners as business expenses for the year 1954 fall into the following categories: (1) $413.65 was for various service calls at the petitioners' residence; (2) $809.15 was for furniture, appliances, and personal clothing; (3) the balance was amounts paid to the Balboa Bay Club and the Jonathan Club. Most of the items in categories (1) and (2) were charged to "Other Materials" on the N. P. Van Valkenburgh Company books. Category (3) was charged to "Sales Expense." In 1955, the petitioner purchased a house at 870 Chester to use as his personal *112 residence. Of the total of $66,719.77 of personal expenses deducted as business expenses in 1955, approximately $60,000 were expenses incurred in connection with the 870 Chester residence, including (a) $6,425 for the construction of a swimming pool; (b) $7,258.86 - remodeling; (c) $10,243.74 - carpeting; (d) $10,399.75 - house painting; (e) $4,541.07 - interior decorating; (f) $4,048.77 - plumbing; (g) $3,064.11 - furniture; (h) $2,844 - patio; (i) $920 - cost of moving household goods to 870 Chester. Other expenses included such things as service calls, television repairs, personal household expenses, phonograph records, family hunting licenses, billford, luggage, fruit of the month, light fixtures, draperies, gardening, liquor and personal clothing. In all, about 126 separate checks were written in payment of personal expenses deducted as business expenses in 1955. These expenses were charged to various accounts on the company books, such as: "Other Materials," "Pipes, Valves, etc.," "Office Expense," "Miscellaneous," and "Sales Expense." A sizeable portion of the $22,201.67 personal expenses deducted as business expenses in 1956 relates to petitioners' personal residence at 870 *113 Chester and his son's (John R. Van Valkenburgh) residence at 1305 Circle Drive. Expenses incurred by the petitioner on his own behalf were for such things as a natural white mink coat, draperies, wearing apparel, hi-fi installation, luggage, electrical work, furniture, gardening, plunbing services, processing deer and elks, swimming pool maintenance, and Christmas decoration of home. Expenses paid on behalf of son, John, were for such things as: (a) $930.70 for painting and paperhanging; (b) $1,062.81 for plumbing services; (c) $210.50 for a dishwasher; (d) $170.53 for washing walls, etc.; (e) $2,411.40 for remodeling. In all, approximately 200 checks were written in payment of such expenses in 1956. The expenses were charged to various accounts on the company books, such as: "Other Materials," "Miscellaneous Job Expense," "Sales Expense," and "Rental of Equipment." During the period 1954 through 1956 the following general procedure was employed by the N. P. Van Valkenburgh Company accounting personnel in paying expenses: Incoming invoices were matched with the purchase order and checked for accuracy. From the invoice the expense was posted in the accounts payable journal. Checks *114 were then prepared by one of the girl assistants and submitted to the petitioner, or his son when the petitioner was absent, for signature. The check stub, which accompanied the checks showed the account on the company books to which the payment had been charged. From the invoices on such expenses it is easily recognizable that most of the items were for personal expenses. The accounting personnel who entered the items as business expenses were aware that the items were in reality personal expenses. However, they charged the items as business expenses under instructions from the petitioner. During the years 1954 through 1956 it was the practice of the petitioner to pay his personal bills through the office of the N. P. Van Valkenburgh Company. The petitioner would bring his personal bills to the office and instruct the bookkeeper, or one of his assistants, to pay the bill. On other occasions he would have his personal bills mailed directly to the office. Prior to 1954 the petitioner instructed his bookkeeper, Staiger, to charge as many of petitioner's personal expenses to business expenses as possible. Acting under these instructions, Staiger personally charged, or directed his *115 assistants to charge, petitioner's personal expenses to business expense on the books of the N. P. Van Valkenburgh Company during 1954, 1955, and the first 6 months of 1956. Staiger became concerned at the amount of expenses relating to the residence at 870 Chester being charged to business. Staiger advised the petitioner at one time that such expenses totaled approximately $50,000. Petitioner instructed Staiger to leave the expenses in business expense. Shortly after bookkeeper Durham was employed, he was instructed by the petitioner not to charge anything to the petitioner's personal account except a monthly $700 draw. In accordance with these instructions, Durham charged numerous personal expenses of the petitioner to business expense. In addition, in August 1956, petitioner instructed Durham to pay a bill in the amount of $2,411.40 to J. C. Messinger for remodeling the personal residence of John R. Van Valkenburgh, the son of petitioner. Petitioner further instructed Durham to enter the expense as a business expense of the company on the books. When interviewed by examining agents from the Internal Revenue Service on February 7, 1958, the petitioner denied ever instructing *116 his accounting personnel to charge his personal expenses to business expenses. The petitioner stated that if such expenses had been charged to business expense, it was without his knowledge or consent. The petitioner further denied incurring substantial expenses in connection with his personal residence at 870 Chester. During the years 1954 through 1956 most job bids submitted by the N. P. Van Valkenburgh Company were either prepared by the petitioner or reviewed by him. In preparing and reviewing such bids it was essential that the petitioner keep abreast of cost incurred on past jobs, and, accordingly, the petitioner reviewed the cost incurred on most large jobs. Accounting Method and Retentions on Construction Contracts During the years 1950 through 1956, the N. P. Van Valkenburgh Company maintained its books and records and computed its income on its financial statements on an accrual method of accounting. During the same period the company reported its income on the same basis as shown on its books and financial statements. Under the accrual method of accounting used by the company, contracts in progress at the end of the year were reviewed by the accountants with management *117 to determine, as nearly as possible, the actual profit or loss realized on the contract during the year. Based on such review, adjustments were made to the books and records to reflect their evaluation. Adjustments were made to (1) eliminate from the cost shown on the books inventory on the job site at the end of the year, (2) eliminate prepaid expenses from cost shown on the books, and (3) give effect to billings rendered by the field but not yet recorded on the home office books. The company's books and records for the taxable year 1951 were examined by certified public accountant George H. Rudd. The company's financial statements for 1951 were also prepared by Rudd. For the years 1952 through 1956, the company's books and records were audited by the firm of Thomas & Moore, certified public accountants. Thomas & Moore also prepared certified financial statements for the company and prepared its tax returns. All of these financial statements contained a certification, as follows: In our opinion, the accompanying balance sheet and statement of income and expense present fairly the financial position of N. P. Van Valkenburgh Co. (a sole proprietorship) at December 31, 1955, and *118 the results of its operations for the year then ended, in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding year. The company's books, financial statements, and tax returns show income from contracts for the period 1950 through 1956 substantially as follows: INCOME
Job
Contracts
Contracts
Contracts
No.
Completed
in Progress **
Extra Work
1950
161
$116,878.42
162
156,326.90
163
17,353.48
164
$ 128,566.00
165
85,947.51
1951
164
60,843.22
165
21,604.95
$ 4,303.25 ***
166
27,471.00
609.00
167
146,008.52
168
155,593.00
1952
168
17,344.00
200.00
172
263,631.00
173
10,342.07
177
144,405.00
178
201,441.00
179
71,152.40
12,285.03
1953
177
159,606.00
178
11,759.00
2,301.19
179
12,967.40
180
573,531.40
522.00
181
755,379.00
182
105,000.00
183
159,760.75
184
10,999.00
1,074.00
185
60,424.02
186
187
16,986.00
1954
183
$ 16,261.10
186
242,142.74
$68,731.00
187
84,014.00
5,712.00
188
111,119.97
189
324,991.42
20,457.81
190
36,104.90 *****
191 & 193
74,969.88
192
15,447.00
194
323,934.34
34,856.59
195
76,440.00
196
$ 141,625.00
Other Jobs
7,270.00
1955
186
24,997.00
21,119.95
196
778,458.27
6,232.87
197
122,580.00
198
107,433.00
199
45,994.40
200
252,055.58
429.82
201
1,336,658.09
52,670.32
202
35,275.90
203
29,224.35
318.00
204
205
206
207
Other Jobs
780.00
1956
201
60,137.33
6,961.77
204
278,817.64
81.18
205
477,112.28
206
196,607.20
207
93,000.00
208
233,507.00
491.00
209
277,360.54
390.00
210
13,009.00
211
1,531,101.13
212
363,949.30
213
107,197.00
214
9,487.50
Other Jobs
28,919.04
*119 Direct Cost
Adjustment
Job
Total
for Contracts
Direct
No.
Expenses a1
in Progress
Profit a2
1950
161
$ 102,747.40
$ 14,131.02
162
141,946.00
14,380.90
163
14,114.19
3,239.29
164
125,306.17
3,259.83
165
85,322.41
625.10
1951
164
61,621.58
(778.36)
165
36,946.21
(11,038.01)
166
29,616.93
(1,536.93)
167
149,639.74
(3,631.22)
168
139,243.43
16,349.57 a3
1952
168
26,537.31
(8,993.31) a4
172
261,223.73
2,407.27
173
10,192.39
149.68 a4
177
132,898.87
11,506.13
178
194,649.74
6,791.26
179
62,381.15
21,056.28
1953
177
142,624.92
16,981.08
178
26,824.15
(12,763.96)
179
30,471.74
(17,504.34)
180
540,427.07
33,626.33
181
736,983.29
18,395.71
182
68,546.95
36,453.05
183
145,655.39
14,105.36
184
5,761.63
6,310.37
185
66,512.04
(6,088.02)
186
2,079.58
$ 2,079.58
0
187
20,397.26
16,125.00
12,713.74
1954
183
$ 13,596.53
$ 2,664.57
186
316,336.02
(5,462.28)
187
117,887.62
(28,161.62)
188
88,883.83
22,236.14 a4
189
338,302.78
7,146.45
190
3,767.38
32,337.52 a4
191 & 193
88,143.78
(13,173.90) a4
192
14,637.32
809.68
194
330,875.56
27,915.37 a5
195
75,540.02
899.98
196
207,981.66
$ 71,444.52
5,087.86
Other Jobs
6,562.33
707.67
1955
186
44,656.71
1,460.24
196
558,441.98
226,249.16
197
62,823.53
59,756.47
198
73,452.37
33,980.63
199
29,482.82
16,511.58
200
257,180.77
(4,695.37)
201
1,375,940.41
13,388.00
202
26,608.53
8,667.37
203
31,939.55
(2,397.20)
204
194,357.15
194,357.15
0
205
248,018.99
248,018.99
0
206
73,620.78
73,620.78
0
207
25,463.79
25,463.79
0
Other Jobs
12,036.62
(11,256.62)
1956
201
84,056.43
(16,957.33)
204
255,453.30
23,445.52
205
463,870.99
13,241.29
206
203,367.95
(6,760.75)
207
88,221.94
4,778.06
208
206,979.80
27,018.20
209
254,929.39
22,821.15
210
11,732.27
1,276.73
211
1,458,651.74
72,449.39
212
335,538.71
15,285.14
43,695.73
213
117,677.59
22,137.78
11,657.19
214
4,829.92
2,275.67
6,933.25
Other Jobs
14,214.75
14,704.29
*120 During the years here involved, the company, on its books, financial statements and returns, reported "retentions" as income in the year the customer was billed. "Retentions" are amounts withheld by customers of N. P. Van Valkenburgh Company to assure satisfactory completion of the contract. Generally the contracts provided that at specific times, as the work progressed, the company had earnings for the work actually performed and the company would receive progress payments less a retained percent. The retained percent was withheld for such periods, as provided for in the contract. Equipment Payments During the years 1953 through 1956 the petitioner claimed the following deductions for equipment rentals: 1953
1954
1955
1956
J. L. Kruly Co.
$2,000.00
$6,000.00
Smith Booth Usher Co.
$43,423.00
$33,688.46
Casey-Metcalf Mach. Co.
10,342.00
5,153.56
Crenshaw Motors
23,117.37
Totals
$2,000.00
$6,000.00
$53,765.00
$61,959.39
*121 The respondent disallowed the claimed expense on the ground that the amounts were in reality for the purchase of the equipment. Accordingly, the respondent determined that the amounts were capital expenditures and allowed depreciation as set forth in Exhibit A attached to the notice of deficiency. Each of the transactions with Smith Booth Usher Co. were in accordance with separate "rental agreements" and "options to purchase." The following is representative of the "rental agreement" used: RENTAL AGREEMENT SMITH BOOTH USHER COMPANY, hereinafter designed as LESSOR, rents and leases to… N. P. Van Valkenburg Company…, hereinafter designed as LESSEE, the following described personal property, to be used in… Los Angeles… County, State of… California… [description] RENTAL: LESSEE shall pay to LESSOR rental for the property as follows: Per Day
$
Per Week
$
Per Month
$1,870.00
Transportation charges to be paid both ways by LESSEE. Rental to start… 3/25/55…. Rental payable in advance. Said rent is to begin on the day the said property is shipped or delivered to LESSEE and is to end on the day that said property is returned by LESSEE to the *122 LESSOR at… 2001 Santa Fe Avenue, Los Angeles, California. Said property is hereby leased for a minimum term of… Twelve (12) Months… and if LESSEE retains said property after the expiration of said term, such retention shall be construed as a continuance of this lease, at the same rental and under the same terms, until said property is so returned to LESSOR at the place above specified. At any time after the expiration of said original term, upon THREE (3) days' written notice to be given by LESSOR to LESSEE, LESSEE agrees to return said property to LESSOR at said place. It is expressly agreed and understood between the LESSOR and LESSEE that all terms and conditions set forth on the reverse side of this Agreement form a part of, and are hereby made part of, this contract. The full agreement between the LESSOR and LESSEE is contained herein, and time is made the essence of this Agreement. IN WITNESS WHEREOF, the LESSOR and LESSEE have hereunto set their hands this… 25th… day of… March 1955, at… Los Angeles, California…. Although the agreement refers to terms and conditions on the reverse side, the reverse side was blank. At or about the time the "rental *123 agreement" was executed, an "option to purchase" was extended to petitioner by Smith Booth Usher Co. The following option is representative of the "option" used: Gentlemen: Referring to Rental Agreement under date of March 25, we are pleased to offer you an option to purchase on the Cleveland Trencher described in the Agreement, at any time after twelve (12) months from date if Lessee be not then in default thereunder, Lessee shall have the option to purchase said equipment upon giving written notice not less than thirty (30) days prior to expiration of the original term thereof. Purchase price shall be $1.00. The figures which make up the Agreement are as follows: 1 - Cleveland Trencher
$21,225.00
Sales Tax
636.75
Finance Charge
578.25
Total
$22,440.00
Should you elect to purchase before the expiration of the minimum rental period, you may do so, and we, of course, will adjust the finance charge accordingly. Very truly yours, SMITH BOOTH USHER COMPANY In all instances the total rental plus the option price was, with minor variances, equal to the selling price of the equipment plus tax and finance charge. The transaction with Casey-Metcalf Machinery *124 Co. was in accordance with an "Equipment Lease" which included the following terms: (a) The lease was for a term of 10 months, beginning July 26, 1955, and ending April 26, 1956. (b) The rental for the entire term was for $15,495.56 of which $3,900 was payable in advance and the balance payable in 9 monthly payments of $1,288.40 each. (c) The lessee was responsible for the expense of all necessary repairs, maintenance, and replacement. (d) The lessee was required to maintain insurance on the equipment at the lessee's expense. (e) The lessee was responsible for all taxes on the equipment. (f) The lessee was entitled to purchase the equipment at the end of the term upon the payment of $1. (g) Operators of equipment must be competent to protect the lessor's interest. (h) Liability of the lessor must be indemnified by the lessee. (i) Insurance must be provided by the lessee to protect the lessor. (j) Taxes must be paid by the lessee to protect the lessor's interest. (k) Title to the property remained in the lessor. (l) Inspection of equipment could be made by the lessor. (m) Default on the lease contract allowed the lessor to take possession of the property. *125 (n) Assignments of the lessor's rights were prohibited. The transactions with the Crenshaw Motor Co. were in accordance with ordinary conditional sales contracts. These contracts all commenced with the following sentence: The undersigned seller hereby sells and the undersigned purchaser hereby purchases subject to the terms and conditions set forth hereunder and on the reverse side hereof the following described property to wit: All of the equipment was "purchased" at the expiration of the "lease" in accordance with the terms of the "option." TACCO Venture - Grain Storage Project in Pakistan In 1954 the petitioner was approached by Paulsen & Dryden, business acquaintances, to associate with them in bidding "some foreign work." A number of jobs in the Near East being offered by the Foreign Operations Administration were investigated. The parties decided to submit a design bid on a grain storage project in Pakistan, and formed a corporation, The Agricultural Construction Co. (TACCO), to pursue the project. In preparation of the bid, expenses were incurred for such things as engineer fees for designing pumps and equipment, preparation of brochures and travel. Petitioner *126 advanced amounts totaling $32,905.30 to cover such expenses. A letter of intent was issued to TACCO, indicating that the Foreign Operations Administration intended to award the project to TACCO. However, by letter dated April 21, 1955, the Federal Operations Administration advised TACCO that all bids on the grain storage project were being rejected and that an engineering firm was being retained to restudy the project, at the completion of which bids would be resought. The $32,905.30 sum was recorded on the books of the N. P. Van Valkenburgh Company in an account entitled "Vandar Corporation Advances." This account shows debits of $40,535.50 and credits of $9,029.56 in the year 1954. In 1955, the account shows debits of $1,399.36. Murdock Account Petitioner and John Murdock engaged in an oil well drilling venture which was unsuccessful. Petitioner expended $27,016.97 in excess of his agreed share of the costs of the venture. Petitioner's financial statement for 1954 shows an account receivable of $27,016.97 due from John Murdock. On November 2, 1955, the petitioner instituted suit in the Superior Court of Los Angeles County to recover the $27,016.97, although at that time Murdock *127 appeared to be without assets. On June 17, 1958, the petitioner and John Murdock executed a "mutual general release" in which petitioner agreed to discharge the liability asserted in the action for a consideration of $100. Staiger Bonus Petitioner's balance sheet for 1955 shows an account receivable due from Carl Staiger in the amount of $7,900. In a letter dated April 3, 1957, to Carl Staiger, signed by Harry W. Moore, the company's accountant, it was stated that the company's books indicated a balance of $7,900 due from Staiger as of December 31, 1956. The letter asked Staiger to advise the accounting firm whether that balance was correct or not. Petitioner's signature appeared at the bottom of the letter indicating that he had authorized the inquiry. On April 15, 1957, the petitioner advised Staiger by letter that the company was giving him a bonus of $7,900 for the year of 1956. Hughes Blades Transactions On or about November 28, 1955, the petitioners owned, as community property, 1000 shares of stock in Hughes Blades, Inc. Petitioner had also loaned the corporation $7,966.55. By a letter agreement dated November 28, 1955, the petitioner agreed to sell both the stock *128 and the loan to his brother-in-law, Ralph Brooks, for $100. Brooks was then the president of Hughes Blades, Inc. The agreement was approved and accepted by Brooks. On December 5, 1955, he paid the $100 by check and received from petitioner the shares of stock and the cancellation of the loan. The $100 was offset against the stock loss and the $7,966.55 loan was deducted in 1955 as a bad debt. Ultimate Findings 1. Petitioners omitted taxable income in each of the years 1950 through 1956 as follows: Year
Amount
1950
$ 4,452.35
1951
5,454.90
1952
2,275.08
1953
401.00
1954
7,516.80
1955
16,713.14
1956
5,084.49
2. Of the amounts disallowed by respondent as personal expenses deducted as business expenses in the years 1954 through 1956 the following amounts are nondeductible personal expenses and ordinary and necessary business expenses: Nondeductible
Deductible
Personal
Business
Year
Expense
Expenses
1954
$ 3,281.48
$1,100
1955
64,519.77
2,200
1956
19,401.67
2,700
3. During the years 1950 through 1956 the N. P. Van Valkenburgh Company maintained its books and reported its income from construction contracts on *129 an accrual method of accounting which clearly reflected its income. 4. Petitioners correctly reported retentions in the years 1955 and 1956. 5. Amounts deducted by petitioners for equipment rentals in the years 1953 through 1956 were, in reality, partial payments of the purchase price of the equipment. 6. Petitioners are not entitled to a business loss deduction of $32,905.30 on the TACCO venture in 1955 or to a bad debt deduction. 7. Petitioners are entitled to a business bad debt deduction of $27,016.97 on the John Murdock account because such debt became worthless in 1955. 8. Petitioners are not entitled to deduct in 1956 a bonus given to Carl Staiger in 1957. 9. Petitioners are entitled to a capital loss on one-half of the total loss on the sale of the Hughes Blades stock and loan. 10. For each of the years 1950 through 1956 a part of the deficiency was due to fraud with intent to evade tax and the income tax returns of petitioners for each of those years were false and fraudulent with intent to evade tax. 11. Petitioners are liable for an addition to tax for the years 1951 and 1952 for substantial understimation of declaration of estimated tax under section 294(d)(2), *130 Internal Revenue Code of 1939. Opinion Issue 1, 2, and 3 - Omitted Income, Personal Expenses Deducted as Business Expenses, and Fraud The principal issue in this case is whether the petitioners filed false and fraudulent income tax returns for each of the years 1950 through 1956. In our judgment the respondent has presented clear and convincing evidence of fraud by proving that in each of these years the petitioners omitted substantial amounts of taxable income from their returns. He has also proved that substantial sums of personal expenditures were fraudulently deducted as business expenses in 1954, 1955, and 1956. In addition, he has shown that the petitioner, Norman Van Valkenburgh, attempted to conceal receipts by causing certain amounts not to be recorded in the books and records of the N. P. Van Valkenburgh Company and that omitted business income was diverted by petitioner and expended by him or members of his family for personal purposes. Consistent failure to report "substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent." Schwarzkopf v. Commissioner, 246 F. 2d 731, 734 (C.A. 3, 1957), affirming *131 a Memorandum Opinion of this Court; Holland v. United States, 348 U.S. 121 (1954), and Kurnick v. Commissioner, 232 F. 2d 678 (C.A. 6, 1956). If the repetitive pattern of substantial understatements of income and the substantial overstatements of deductions by a man of petitioner's intelligence were the only factors involved, we would feel justified in finding a fraudulent intent in this case. But there are other "badges of fraud." Respondent's proof of fraud as to omitted income is clear and convincing. Not only has the petitioner admitted that many receipts were omitted, but he also attempted to conceal the receipts of omitted income by not having the amounts entered in his company's books and records, and such income was mostly expended for personal purposes. Petitioner offered no explanation in his testimony as to why the receipts had been omitted from his books and records and income tax returns. He simply stated that he was unaware that the receipts were omitted. The record, however, refutes his statement for it shows that, in some cases, the receipts were omitted from the books and records by the petitioner's bookkeeper under instructions from him *132 and, in other cases, the petitioner caused the receipts to be omitted. Carl Staiger, who was deceased at the time of trial, was the petitioner's bookkeeper from 1937 to the first part of July 1956. In a statement made on February 11, 1958, Staiger said that he was instructed by the petitioner not to record certain billings in his books and records and to turn the payment from the billing over to the petitioner when it was received. Staiger further stated that on other occasions he noted that certain incoming checks were retained by the petitioner and that the invoices for such receipts disappeared before they could be entered on the books and records. The petitioner, of course, denies such statements. However, we believe the record corroborates Staiger's statements. In the first place, the record establishes that the receipts were deliberately and intentionally omitted from the books and records. During this period the N. P. Van Valkenburgh Company used the following procedure in recording receipts on its books and records: Multiple copies of invoices were prepared and forwarded to the customer with at least one copy being retained by the N. P. Valkenburgh Company. From a copy *133 of the invoice, an appropriate entry was made in the sales journal. Upon receipt of payment, an appropriate entry was made in the accounts receivable journal. Under this system, in order for a sale not to be entered on the books, something had to occur to prevent the invoice from being entered in the sales journal and the receipts of payment from being posted to accounts receivable. The parties have stipulated that all the unreported receipts were invoiced by the company. However, at the time of respondents examination, the company's copies of these invoices were missing from its files. It is highly unlikely that under the system employed by the N. P. Van Valkenburgh Company over 90 separate sales could have been omitted by human error from its books and records. For a sale to go unrecorded, the bookkeeping personnel would have to neglect recording the sale in the sales journal at the time of the invoice and neglect to record the receipt of subsequent payment. Secondly, by acknowledging his participation in a scheme to defraud the United States Government of taxes, Staiger implicated himself. Petitioner has given us no plausible explanation of why Staiger would have deliberately *134 omitted the receipts from the books and records. Since the omitted income is all traceable to the petitioner or members of his family, the conclusion we draw is that Staiger's explanation is correct. Petitioner's contention that the omitted receipts were expended for business travel, entertainment, and other deductible business items is not supported by the evidence. We have only the petitioner's general, vague, and often unreliable testimony that the omitted amounts were so expended. On cross-examination his answer was that he knew nothing about the items in question. It is indeed difficult for us to understand how the petitioner can say that the omitted amounts were expended for deductible purposes if he had no recollection of them. Moreover, the records indicate that many of the items were not expended for business travel and entertainment. For example, one check for $1,386.60 was invested by the petitioner in Hughes Blades, Inc. Many of the checks were deposited by the petitioner or his wife in his personal bank account, and others were endorsed by the petitioner to his son, who, in turn, deposited the checks in his own personal account. A few of the checks were cashed by his *135 brother, John. None of the checks were deposited in his business bank account where all incoming business checks were customarily deposited. The amounts of the checks representing the omitted income cast doubt on the petitioner's contentions. Many of the checks were for amounts ranging from $1,000 to $2,000 and were cashed by him at the Shopping Basket Market. There is nothing in the record to show that the petitioner ever needed such large sums at once for business travel and entertainment. In each of the years in question substantial sums were deducted on his returns for business travel and entertainment. Petitioner had a bookkeeper with two assistants. It seems strange that such large amounts could have been expended for business purposes without being entered on the books. When this is added to the fact that all of these amounts represent sales which were not recorded and payments which were not recorded, we believe such a contention must be rejected. Statements made by the petitioner when interviewed by the revenue agent and special agent at the time of respondent's investigation confirm the fact that petitioner deliberately omitted receipts. Petitioner stated to the agent *136 that he seldom, if ever, rented equipment. He further stated that during the period from 1952 to 1958, he did not receive more than $600 or $800 a year for rental of equipment. Other than the sewer connection receipts, most of the omitted amounts were receipts from the rental of equipment. In short, it is quite apparent from this record that the petitioners and members of their family were literally "living out of the business" and that income was omitted with the intention of avoiding the payment of income tax. Probably even more flagrant was the overstatement of deductions. Substantial amounts of personal expenditures were deducted as business expenses. Here again, the petitioner attempted to conceal the true nature of the expenditures by instructing his bookkeeping personnel to enter the amounts as business expenses on the books and records of N. P. Van Valkenburgh Company. Examination of some of the expenditures quickly reveals their personal, rather than business, character. In 1955, a total of $66,719.77 of personal expenses was deducted as business expenses on their tax return. Most of these expenses related to a house purchased by the petitioners at 870 Chester. The expenses *137 were for such things as: $6,425 for the construction of a swimming pool; $7,258.86 for remodeling; $10,243.74 for carpeting; $10,399.75 for house painting; $4,541.07 for interior decorating; $4,048.77 for plumbing; and $3,064.11 for furniture. Other personal expenses deducted as business expenses included the cost of moving petitioner's household goods to the new residence, service calls, television repairs, personal household expenses, phonograph records, family hunting license, bill folder, luggage, light fixtures, draperies, gardening, liquor, and personal clothing. In 1956 a total of $22,201.67 of personal expenses was deducted by petitioners as business expenses. Most of these expenses related to their residence at 870 Chester and the residence of their son at 1305 Circle Drive. The expenses included such things as a natural white mink coat, draperies, wearing apparel, hi-fi installation, luggage, electrical work, furniture, gardening, plumbing services, processing deer and elk, swimming maintenance, Christmas decorations for the home, painting and paperhanging, a dishwasher, and remodeling. In 1954 a total of $4,381.48 of personal expenses was deducted as business expenses. *138 These expenses included service calls at the petitioner's residence, furniture, appliances, personal clothing, and some personal club expenses. Petitioner's salient thrust is that he was completely unaware that these expenses had been charged to business expense on his books and records and deducted on his income tax returns. This seems incredible in view of the large amounts involved and the frequency of the expenditures. Staiger in his statement of February 11, 1958, said that the petitioner instructed him to charge as many of the personal expenses to business expenses as possible. Acting under these instructions, Staiger personally charged, or directed his assistants to charge, many of petitioner's personal expenses to business expenses on the books of the N. P. Van Valkenburgh Company during 1954, 1955, and the first 6 months of 1956. Staiger became concerned at the amount of expenses relating to the residence at 870 Chester being charged to business. At one time he advised the petitioner that such expenses totaled approximately $50,000. The petitioner ignored Staiger's warnings that the expenses should not be charged to business and instructed Staiger to leave the expenses *139 in business expense. Staiger was replaced by Durham as the petitioner's bookkeeper in July 1956. Durham testified that shortly after he was employed he was instructed by the petitioner not to charge anything to the petitioner's personal account except a monthly draw $700of. Durham further testified that, in accordance with these instructions, he charged personal expenses to business expense on the books and records of the N. P. Van Valkenburgh Company. In addition, Durham specifically recalled that, in August 1956, the petitioner instructed him to pay a bill in the amount of $2,411.40 for the remodeling of the personal residence of the petitioner's son and to enter the expense as a business expense of the N. P. Van Valkenburgh Company on the books. Many of the expenses were actually entered on the books and records of the N. P. Van Valkenburgh Company by the two assistants to the bookkeeper, Shireley Val Dere and Jean Kennedy. Both testified that they were aware that the items were personal expenses, but that they were instructed by Durham and Staiger to enter the expenses as business expenses. Shirley Val Dere further stated that on occasions she had charged personal expenses *140 to business expenses at the direction of the petitioner. Not only is the petitioner's testimony that he was unaware that the personal expenses were being charged to business expenses impeached by the statements of other witnesses, but there are other indications in the record that his testimony is untrue. The expenses were paid with N. P. Van Valkenburgh Company checks. Under the procedure employed by the company during this period, checks were prepared by the bookkeeping personnel and submitted to the petitioner, or his son when petitioner was absent, for signature. The check stub which accompanied the check showed the account on the company's books to which the payment had been charged. In view of the large number of checks involved we find it difficult to believe that petitioner would never have discovered that his personal expenses were being charged to business. All in all, the evidence convinces us that the petitioner knowingly claimed substantial personal expenditures as business expenses in 1954, 1955, and 1956. However, for each of these years we think some of the expenditures claimed were ordinary and necessary business expenses and deductible as such. Our ultimate findings *141 reflect the amounts which are allowed. Applying the rule of Cohan v. Commissioner, 39 F. 2d 540, we have used our best judgment to make an approximation of the expenditures which we believe were related to the business, bearing heavily against petitioner for his inexactitude. Needless to say, the amounts we have allowed may be high or low, but with so many separate items to consider we cannot be completely accurate. Counsel for petitioners has devoted several pages of his opening brief to arguments that the sworn statements of Carl Staiger taken on February 11, 1958 (Exhibit CY) and on October 27, 1959 (Exhibit CZ), as well as the question and answer statement of petitioner given on February 7, 1958 (Exhibit CX), are inadmissible and that this Court should give no weight to anything contained therein. It is understandable why the petitioner is so concerned about the admissibility of these documents because they are very damaging to his case. At the trial this Court admitted these documents in evidence and we denied the petitioner's motion to suppress the question and answer statement of Norman Van Valkenburgh. Carl Staiger, who was deceased at the time of trial, had *142 been the principal bookkeeper for petitioner from 1937 to July 1956. He was petitioner's agent and employee and he followed instructions given him. Petitioner characterizes Staiger's statements as "smelly" hearsay and inadmissible as declarations against interest, an exception to the hearsay rule. We disagree. Staiger knowingly implicated himself in petitioner's income tax matters. Contrary to petitioner's assertion, Staiger acknowledged his participation in the fraudulent scheme of petitioner to evade income taxes. He admitted that he made fraudulent entries and omissions in the books and records, instructed his assistants to do likewise, and prepared petitioner's income tax returns for 1950 and 1951. There is likewise no merit to the argument that Staiger did not know the statements were against his interest when made. Staiger was a public accountant when the statements were made and he had been for years. Staiger stated that the reason he terminated his employment with petitioner was: A. I believe I stated that all in the previous interview which you mentioned, but I will say again probably because of too many tax matters getting beyond my control. Q. You mean tax matters of *143 Mr. Van Valkenburgh? A. That is correct. Matters that I did not believe were true matters of tax deductions; that personal expenses were being put in as business expenses. Petitioner also argues that Staiger's statements were not against his interest because they would not have been admissible in an action against Staiger. In support of this argument petitioner states that there is no evidence in the record that Staiger was given the constitutional warning of his rights under the Fifth Amendment or advised of his right of counsel. From this, he concludes that the statements would have been inadmissible against petitioner. Assuming arguendo that failure to advise Staiger of his Fifth Amendment rights and right to counsel would render Staiger's statements inadmissible in an action against him, it is plain that the present record is inadequate to determine if such warnings were or were not given. Certainly we will not presume that the respondent's agents have violated the law without any showing that they have. Staiger's statements were taken by revenue agent Akola and special agent Freeman, both of whom testified at the trial and were not questioned by petitioner's counsel as to *144 this matter. Petitioner's assertion that Staiger, knowing that his statements would be inadmissible in a proceeding against him, "informed" on himself and petitioner in order to "knife" petitioner and collect an informer's award, is purely conjectural and not supported by the evidence. It is generally recognized that there are two tests applied to the creation of an exception to the hearsay rule: (1) a requirement of necessity, i.e., that the person whose assertion is offered is now dead, insane, out of the jurisdiction, or otherwise unavailable, and (2) there is circumstantial probability of the trustworthiness of the hearsay declaration. 5 Wigmore on Evidence, Section 204 (3rd Ed. 1940). Accordingly, the rationale underlying the admission of a declaration against the pecuniary interest of a deceased person is the likelihood that such statements are true. 2 Jones on Evidence, Section 295 (5th Ed. 1958); 5 Wigmore on Evidence, Sections 455-477 (3rd Ed. 1940); and McCormick on Evidence, Sections 253-257. Here the record corroborates both sworn statements of Staiger. We see no reason why Staiger would have implicated himself in the petitioner's fraudulent scheme to evade income taxes *145 unless such statements were true. Consequently, the statements are admissible and we have given them some weight, while relying also on the testimony of other witnesses. To be sure, many of Staiger's statements appear in the light of other testimony to have a rather high degree of trustworthiness; indeed more than the petitioner's own self-serving statements. We turn next to the claim that we erred in admitting into evidence the recorded question and answer statement of petitioner which was taken by respondent's agents on February 7, 1958. Petitioner advances three arguments. First, he contends that the statement should be excluded because petitioner was not issued a summons or given 10-days' notice before his appearance. His position is that in cases where a taxpayer is suspected of filing fraudulent returns, respondent's agent may not interview the taxpayer unless a summons is issued under section 7602, Internal Revenue Code of 1954, and the taxpayer is given 10 days to appear under section 7605. Petitioner cites no authority for this proposition. Indeed, sections 7602 and 7605, on their face, refute petitioner's contention. Section 7602 provides as follows: *146 SEC. 7602. EXAMINATION OF BOOKS AND WITNESSES. For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized - (1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry; (2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and (3) To take such testimony of the person concerned, under oath, *147 as may be relevant or material to such inquiry. While section 7602(2) authorizes the respondent to issue summonses requiring taxpayers to appear before the respondent and testify and produce books and records, section 7602(3) authorizes the respondent to take the testimony of a taxpayer without the issuance of a summons. Section 7602(3) makes no distinction between taxpayers suspected of fraudulent returns and other taxpayers. Section 7605 lends no support to the petitioner's contention. It provides: SEC. 7605. TIME AND PLACE OF EXAMINATION. (a) Time and Place. - The time and place of examination pursuant to the provisions of section 6420(e)(2), 6421(f)(2), 6424(d)(2), or 7602 shall be such time and place as may be fixed by the Secretary or his delegate and as are reasonable under the circumstances. In the case of a summons under authority of paragraph (2) of section 7602, or under the corresponding authority of section 6420(e)(2), 6421(f)(2), or 6424(d)(2), the date fixed for appearance before the Secretary or his delegate shall not be less than 10 days from the date of the summons. (b) Restrictions on Examination of Taxpayer. - No taxpayer shall be subjected to unnecessary *148 examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary. The 10-day period mentioned in section 7605 refers only to instances in which a summons has been issued. Furthermore, even if the procedure followed by respondent in this case was not specifically authorized by section 7602(3), the statement still would not be excludable under section 7602(2). The provisions of sections 7602 and 7605 are not mandatory and may be waived. Cf. Rife v. Commissioner, 356 F. 2d 883 (C.A. 5, 1966); and United States v. O'Connor, 237 F. 2d 466 (C.A. 2, 1956). Here the petitioner voluntarily agreed to make the statement hoping to persuade the agents that their suspicions of fraud were unjustified. Having failed to achieve his objective, he now seeks to suppress the statement. We are unwilling to permit the petitioner to pursue such a course with immunity. Therefore, even if sections 7602(2) and 7605 did require the issuance of a summons, *149 we view the petitioner's conduct as constituting a waiver of such a requirement. The second and third arguments urged by petitioner are that the question and answer statement should be excluded because he was not given a warning of his constitutional right to remain silent and was not advised of his right of counsel. We reject both of these arguments. The record shows to our satisfaction that the petitioner was, in fact, given a constitutional warning of his rights to remain silent and his right to counsel. Special agent Freeman testified that he recalled so warning the petitioner. We believe Freeman's testimony rather than the vague testimony of petitioner and his son, Lee. But even if the petitioner was not so advised by Freeman, his statement is still admissible. When the statement was taken, respondent's agents were engaged in investigative activities. It has been repeatedly held in several recent cases that the Commissioner's agents are not required to advise a taxpayer of his constitutional rights prior to investigative, noncustodial interrogations. Kohatsu v. United States, 351 F. 2d 898 (C.A. 9, 1965), certiorari denied 384 U.S. 1011 (1966); Rickey v. United States, 360 F. 2d 32 *150 (C.A. 9, 1966); Smith v. United States, 250 F. Supp. 803 (D.N.J. 1966); United States v. Fiore, 258 F. Supp. 435 (W.D. Pa. 1966); United States v. Schlinsky, 261 F. Supp. 265 (D. Mass. 1966); United States v. Maius, 378 F. 2d 716 (C.A. 6, 1967); and Morgan v. United States, 377 F. 2d 507 (C.A. 1, May 16, 1967). As a prospective criminal tax violation, this case never proceeded past the investigative stage. In the latter part of 1957 revenue agent Akola was assigned to examine the petitioner's 1955 income tax return. In December 1957 Akola telephoned petitioner's office and made arrangements to appear at the office and examine his books and records. Akola spent about two weeks at the petitioner's office examining various books and records. During this examination Akola uncovered what appeared to him to be indications of fraud. About January 7, 1958, Akola suspended his investigation and referred the matter to the Intelligence Division. On January 14, 1958, the Intelligence Division assigned special agent Freeman to make a preliminary investigation. After contacting some third parties, Freeman made several attempts to *151 arrange an interview with petitioner by telephone. Finally, on the morning of February 11, 1958, Freeman successfully arranged by telephone an interview with petitioner. Upon arriving at the general offices of the petitioner Freeman and Akola went directly to the office of the bookkeeper, Collins, who informed the petitioner that Akola and Freeman had arrived. Shortly thereafter, the agents were led into petitioner's office by Collins. Petitioner's son, Lee, was present. Freeman showed the petitioner his credentials and advised him that Akola had referred his case to the Intelligence Division to investigate indications of fraud uncovered by Akola. After this brief introduction, Freeman proceeded to interview the petitioner. The interview was recorded by a stenographer accompanying Freeman. After the interview, the agents continued their investigation by contacting numerous third parties with respect to petitioner's business activities. Subsequently, with petitioner's consent, Freeman and Akola returned to the general offices to continue the examination of petitioner's books commenced by Akola. The following day the agents were requested by counsel for petitioner not to return. No arrests *152 or indictments ever arose out of the investigation. Petitioner's statement would have been admissible in a criminal proceeding against him under the authorities cited above. Since the statement would have been admissible in a criminal proceeding, it is obviously admissible in this civil proceeding. See, e.g., Hinchcliff v. Clarke, 371 F. 2d 697 (C.A. 6, 1967), reversing 230 F. Supp. 91 (N.D. Ohio, 1963). Moreover, even if the statement were inadmissible as to petitioner so as to give him standing to challenge it being received as affirmative evidence against him, there is authority for holding that it may be used, as respondent has used it here, to impeach petitioner's testimony that his returns were true and correct or otherwise contradict statements made by him on direct examination. See Compton v. United States, 334 F. 2d 212, 217-218 (C.A. 4, 1967), where the Court of Appeals quoted the following statements from Walder v. United States, 347 U.S. 62, 65 (1954): It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the *153 illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the Weeks doctrine would be a perversion of the Fourth Amendment. The cases of United States v. Lipshitz, 132 F. Supp. 519 (E.D.N.Y. 1955), and United States v. Guerrina, 112 F. Supp. 126 (E.D. Pa. 1953), are not in point. Unlike the agents in Lipshitz and Guerrina, respondent's agents here did not obtain any information or records by deceit, misrepresentation, stealth, or trickery. Issues 4 and 5. - Accounting Method and Retentions Under Construction Contracts Petitioners have attempted to prove that the taxable income from various construction contracts shown on their income tax returns for 1955 and 1956 was erroneous and that it should be recomputed on the completed contract method of accounting. In support of such position, it is contended that during the years 1955 and 1956 income was reported from construction contracts under the accrual method, the percentage of completion method, and the completed contract method; that, as such, no consistent method of *154 accounting was used; that under section 446(b), where no method of accounting has been consistently used by the taxpayer, the computation of taxable income shall be made under such method as does clearly reflect income; and that the completed contract method is the only method which clearly reflects income from construction contracts during these years. To the contrary, it is respondent's position that the income from such contracts was correctly reported in the returns. We agree with the respondent. In our opinion the record establishes that an accrual method of accounting was consistently used by the N. P. Van Valkenburgh Company during the years 1950 through 1956. This conclusion is supported by the testimony of Harvey W. Moore of Thomas & Moore, certified public accountants who audited the company's books and prepared its financial statements and tax returns for the years 1952 through 1956. Moore testified that throughout this period the company's books had been maintained on an accrual method of accounting and that the company had reported its income on its tax returns in the same fashion. Under the accrual method used, contracts in progress at the end of the year were reviewed *155 by the accountants with management to determine, as nearly as possible, the actual profit or loss realized on the contracts during the year. Based on this review, adjustments were made to the books and records to reflect their valuation. Adjustments were made to eliminate from the cost shown on the books the inventory on the job site at the end of the year; eliminate prepaid expenses from costs shown on the books; and give effect to billings rendered by the field but not yet recorded on the home office books. [1] Moore's testimony is fortified by other evidence. In each of the years the accounting firm prepared certified statements for the petitioner's company. These statements were prepared shortly after the close of the taxable year involved at a time when the events being reflected were fresh in the minds of all those involved. These statements certified that the petitioner had reported his income on a basis consistent with that of preceding years. By contrast, the petitioner relies on the testimony of Bernice Alsweet Anglea, *156 also a certified public accountant. Compared with Moore's testimony Bernice Anglea's testimony does not persuade us. Her analysis is patently weak and entitled to little, if any, weight. Her testimony related to only a small number of the contracts involved. She had not examined the books and records of the company in such detail as to understand fully the nature of the figures and items reported therein. She did not even express an opinion as to whether the completed contract method would clearly reflect income. Petitioner's Exhibit 4 merely lists the billings and expenses shown on the profit and loss statement by jobs and year and shows how the jobs were reported on the petitioner's tax returns. There is no explanation of what amounts are included in "billings" and "expenses." There is no other evidence as to the nature of the "billings" and "expenses" or as to the nature of the jobs involved. Moreover, since Exhibit 4 is based upon the financial statements prepared by Thomas & Moore, we regard their explanation as controlling with respect to the method of accounting which these figures reflect. It is plain that what the petitioner is attempting to do here is to change to a different *157 accounting method than the one used in the books and records. No doubt this is motivated, at least in part, by his desire to shift income out of the years 1955 and 1956 in which the respondent has asserted fraud. We view this attempt as being contrary to section 446(a), Internal Revenue Code of 1954, which provides that taxable income is to be computed according to the taxpayer's regular method of accounting. The only authority for using the completed contract method is section 1.451-3, Income Tax Regs., which permits the use of special methods of accounting for income from "long-term contracts." Upon proper election, income from qualifying contracts can be reported on either the percentage of completion or completed contract method of accounting. Section 1.451-3 provides, in pertinent part, as follows: Long-term contracts (a) Definition. The term "long-term contracts" means building, installation, or construction contracts covering a period in excess of one year from the date of the execution of the contract to the date on which the contract is finally completed and accepted. (b) Methods. Income from long-term contracts (as *158 defined in paragraph (a) of this section), determined in a manner consistent with the nature and terms of the contract, may be included in gross income in accordance with one of the following methods, provided such method clearly reflects income. * * *
(2) Completed contract method. Gross income derived from long-term contracts may be reported for the taxable year in which the contract is finally completed and accepted. Under this method, there shall be deducted from gross income for such year all expenses which are properly allocable to the contract, taking into account any material and supplies charged to the contract but remaining on hand at the time of completion. (c) In general. Long-term contract methods of accounting apply only to the accounting for income and expenses attributable to long-term contracts. Other income and expense items, such as investment income or expenses not attributable to such contracts, shall be accounted for under a proper method of accounting. See section 446(c) and paragraph (c) of § 1.446-1. A taxpayer may change to or from a long-term contract method of accounting only with the consent of the Commissioner. See section 446(e) and paragraph *159 (e) of § 1.446-1. When a taxpayer reports income under a long-term contract method, a statement to that effect shall be attached to his income tax return. Subsection (c) of section 1.451-3 specifically provides that a taxpayer may change to or from the long-term contract method of accounting only with the consent of the Commissioner. See also section 446(e) of the 1954 Code. Here the petitioner has neither requested nor received respondent's permission to change to the completed contract method. Since he fails to qualify under the above regulation and there is no other authority for the use of completed contract method, it is clear that the proposed change would, in any event, be invalid. Not only has the petitioner failed to obtain the respondent's permission, which in and of itself is fatal, but the record fails to show any proper reason for changing to the completed contract method. Totally ignored by petitioner is the overriding principle in the permissible accounting method area that a taxpayer may only use those methods of accounting which clearly reflect its income. Section 446(a). It is specifically provided in section 1.451-3 of the regulations that the completed contract *160 method may be used only when it clearly reflects income. Section 446(b). There is no competent evidence contained in this record to show that the completed contract method would clearly reflect the petitioner's income. In fact, the evidence is otherwise. While there may be some doubt as to whether a taxpayer is bound by an election to report income under an accounting method which does not clearly reflect income, it is well established that if the taxpayer elects a method which does clearly reflect income, he is bound by such election. See Pacific National Co. v. Welch, 304 U.S. 191 (1938); Daley v. United States, 243 F. 2d 466 (C.A. 9, 1957); and Lord v. United States, 296 F. 2d 333 (C.A. 9, 1961). Petitioner further contends that the regular accrual method clearly reflects income only if billings to customers are an accurate measure of income. Regardless of the merit of this contention, the record here fails to show whether or not the billings to the petitioner's customer were an accurate measure of income. Petitioner further contends that the percentage of completion method would not clearly reflect its income because it is virtually impossible *161 to accurately estimate cost to complete a contract because of the underground nature of the work. Agin there is no evidence to support this contention. And, finally, the petitioner contends that the completed contract method is the only method which clearly reflects its income because of the inherently hazardous and unpredictable nature of petitioner's operations. Again the short answer to this contention is that the record does not reveal whether petitioner's operations were inherently hazardous and unpredictable. We turn next to the consideration of petitioner's assertion that he erroneously reported retentions for the years 1955 and 1956 and is now entitled to correct such errors. As we have already concluded, the petitioner maintained his books and reported income on the accrual method of accounting. Under this method the company accrued retentions as income in the year the work was performed. The returns for the years 1950 through 1956 reported retentions on the same basis as shown on the books. The petitioner now proposes to report retentions in the year actually collected. We reject this effort. The method used by the petitioner was clearly a permissible method. Once having *162 elected to use that method, he is bound by the election. Wright Contracting Co.36 T.C. 620 (1961), affd. 316 F. 2d 249 (C.A. 5, 1963). Furthermore, the proposed change conflicts with section 446(a) which requires a taxpayer to compute taxable income in the same fashion as regularly computed on his books and records. The proposed change would also constitute a change in accounting method which requires the Commissioner's consent under section 446(e). Wright Contracting Co., supra., Commissioner v. O. Liquidating Corporation, 292 F. 2d 225 (C.A. 3, 1961). The petitioner has neither sought nor received such permission for the proposed change of accounting methods. As with the proposed change to the completed contract method, there is no proof that the method used by petitioner in reporting retentions does not clearly reflect income. The only evidence in this regard was Moore's testimony that the method used correctly reflected income. In addition, the method proposed by the petitioner for reporting retentions is inconsistent with his proposed change to the completed contract method since under the completed contract method *163 all income is reported in the year the contract is finally completed and accepted. The cases cited by petitioner are distinguishable. In Wright Contracting Company, supra at p. 635, Dally v. Commissioner, 227 F. 2d 724 (C.A. 9, 1955), affirming 20 T.C. 894 (1953) and United States v. Harmon, 205 F. 2d 919 (C.A. 10, 1953) were distinguished by this Court, as follows: In this case, unlike the cases cited by petitioner, the taxpayer had consistently followed a long-established system or practice of accounting on its books and reporting for taxation (except for the last taxable year) the so-called retainage, which, when followed, adequately and accurately reflected its income, and the taxpayer itself made a change in this system or practice with regard to reporting such earnings for the last taxable year, n3 which had substantial adverse effects upon the revenues and made such change without the prior consent of the Commissioner. [Footnote omitted.] Marquardt Corporation, 39 T.C. 443 (1962), relied on American Can Company, 37 T.C. 198 (1961), which was reversed on this issue by the Court of Appeals for the Second Circuit, 317 F. 2d 604). *164 Accordingly, we sustain respondent on this issue. Issue 6. - Payments for Equipment In his notice of deficiency the respondent disallowed claimed "rental" expenses for the reason that such payments were, in reality, partial payments on the purchase price of the equipment and, in lieu of rental expense, allowed depreciation. Petitioner challenges the disallowance of the claimed rental expense and, alternatively, claims that the depreciation allowed is incorrect. The only evidence pertaining to this issue consists of purported leases and other documents. On brief the petitioner argues purported facts which are not supported by any evidence. Section 162(a)(3), Internal Revenue Code of 1954, provides: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in *165 which he has no equity. Section 23(a)(1)(A), Internal Revenue Code of 1939, contains substantially the same language. Regardless of the form or nomenclature of the transaction, so-called "rental" payments must be treated as partial payments of the purchase price of property if by virtue of the payments the taxpayer has acquired, or will acquire, title to or an equity in the property. Such a transaction is, in reality, a conditional sale, not a lease. See Chicago Stoker Corporation, 14 T.C. 441 (1950); D. M. Haggard, 24 T.C. 1124 (1955), affd. 241 F. 2d 288 (C.A. 9, 1957); and Ersel H. Beus, 28 T.C. 1133 (1957), affd. 261 F. 2d 176 (C.A. 9, 1958). The fact that the parties term a transaction a "lease" is not controlling if all the elements of a conditional sale are present. Oesterreich v. Commissioner, 226 F. 2d 798 (C.A. 9, 1955). The incidence of taxation depends on the substance and not on the form of a transaction. The transactions may be divided into two categories. In the first category are the Crenshaw Motor Company transactions involving pickup trucks. The agreements in these transactions *166 were ordinary conditional sales contracts and, without question, the payments were merely part of the purchase price of the trucks. H. G. Irby, Jr., 30 T.C. 1166 (1958), affd. 274 F. 2d 208 (C.A. 5, 1960). In the second category are transactions in which the agreements were cast in the form of "leases" with options to purchase. All of these "leases" were for short periods of time, varying from 7 to 15 months, which periods were substantially less than the useful life of the equipment. Under the "leases" the petitioner was obligated to "rent" the equipment for a minimum term. In all instances the total "rent" due (minimum term X monthly rent) was approximately equal to the original selling price of the equipment plus finance charges. At the end of the "lease" term the petitioner had the option of purchasing the equipment for substantially the difference between the original selling price (plus finance charges) and the total rent paid, which in most instances amounted to the nominal sum of $1. As we see it, the petitioner was acquiring, through the "rent" payments, something more than the mere use of the equipment. These purported "leases" were, in reality, *167 conditional sales contracts. Starr's Estate v. Commissioner, 274 F. 2d 294 (C.A. 9, 1959); Quartzite Stone Co., 30 T.C. 511 (1958), affd. 273 F. 2d 738 (C.A. 10, 1960); and Mt. Mansfield Television, Inc. v. United States, 239 F. Supp. 539 (D.C. Vt. 1964), affirmed per curiam 342 F. 2d 994 (C.A. 2, 1967), certiorari denied 382 U.S. 818. There are several features of the purported leases which tend to show that a conditional sale was intended. Among these are: 1. Under the Casey-Metcalf lease the petitioner was obligated to pay for all insurance, taxes, repairs, and maintenance. Mt. Mansfield Television, Inc. v. United States, supra. 2. The Smith Booth Usher "leases" did not have any terms and conditions set forth, which seems rather unusual in the rental of expensive equipment. 3. Finance charges were added to the original selling price in computing the option price. Mt. Mansfield Television, Inc. v. United States, supra. Petitioner's reliance on Western Contracting Company v. Commissioner, 271 F. 2d 694 (C.A. 8, 1959), reversing a Memorandum Opinion of *168 this Court, is misplaced because, unlike the instant case, the lessee did not have options to purchase the equipment. See Starr's Estate v. Commissioner, supra. Respondent agrees that the petitioner may use the double declining balance method of computing depreciation on the equipment, but objects to the useful lives used by petitioner. Since there is no competent evidence to show that the respondent erroneously determined the useful lives of the equipment, we uphold his determination in this respect. Issue 7 - TACCO Venture - Grain Storage Project in Pakistan In 1954 the petitioner was approached by business acquaintances to associate with them in bidding some foreign work. Pursuant thereto, the parties submitted a design bid on a grain storage project in Pakistan to the Foreign Operations Administration and formed TACCO to pursue this project. Petitioner advanced $32,905.30 in preparation of the bid. TACCO was issued a letter indicating an intent to award the bid to it; however, by letter dated April 21, 1955, TACCO was advised that all bids on the grain storing project were being rejected, that the project was being restudied, and that at the completion of this *169 study bids would be resought. The $32,905.30 advanced by petitioner, which amount reflected debits of $40,535.50 and credits of $9,029.59 in 1954 and debits of $1,399.36 in 1955, was carried on the N. P. Van Valkenburgh Company's books in an account entitled "Vandar Corporation Advances." Petitioner testified that Vandar was not involved in the grain storage project and has not explained why the amounts spent on that project were treated as advances to it. Petitioner has abandoned his argument that he is entitled to a bad debt deduction in the year 1955. Instead he contends that he can deduct that amount as a business loss. We cannot agree. Petitioner argues that the amounts it forwarded on this project went to the business entity, TACCO, as a joint venture between himself and business associates. He apparently contends that while the corporation TACCO was formed as of that time, it was not to become an operating, viable entity until the bid was accepted. However, the letter from the Foreign Operations Administration dated April 21, 1955, was addressed to "The Agricultural Construction Company" (TACCO) and spoke of seeking bids, after further study, from "qualified firms," the inference *170 being that the letter's recipient so qualified as a "firm." From this it is clear that the Foreign Operations Administration thought that it was dealing with a corporate entity. Likewise, aside from the vague statement that the debits of $9,029.56 on petitioner's books which came from Vandar corporation were either advances to the grain project from Herron or simply adjusting entries, the petitioner has not sufficiently explained these items which otherwise would appear to be income earned from Vandar's operations. This at least indicates that Vandar did not depend upon the receipt of the grain storage bid before it went into operation. Moreover, if Vandar was not in operation, as petitioner contends, at the time the bid was sent out, we fail to understand why the amounts in question were treated as advances to it. As a result of these factors, it seems that the advances in question were not made to TACCO as a joint venture, but rather were in the nature of capital contributions to a corporation (regardless of whether this corporation was in fact TACCO or Vandar) formed for the express purpose of bidding in and handling the grain storage project. As such, these amounts cannot be the *171 basis for a business loss under section 165. Even if we assume that the amounts are in the nature of a business loss, petitioner has not shown that 1955 is the proper year for their deductibility. The letter from the Foreign Operations Administration did not state that the bid had been awarded to another party, but rather that the bids would be resought at a later date. Thus, as of April 21, 1955, TACCO still had a chance of being awarded the project, and expenditures in preparing the bid were not necessarily worthless as of that date. Since the record fails to show any subsequent transactions with regard to this project, we are unable to determine whether any business loss was sustained in 1955 or whether the project was cancelled or the bid awarded to another party in a subsequent year. We hold for the respondent on this issue. Issue 8. - Murdock Account Petitioner entered into a joint venture with Murdock to drill for oil. A dry hole resulted and no income was realized. Petitioner made advances of $27,016.97 to the venture in excess of his agreed share. In November 1955, a suit was filed in the Superior Court of Los Angeles County to collect such amount from Murdock. Immediately *172 after the suit was filed, the petitioner determined (in 1955) that collection was not possible because Murdock had no assets. The suit was terminated by a release in 1958. Clearly this constituted a business bad debt. See Robert W. DePuy, 14 T.C.M. 268 (1955). Therefore, when did the debt become worthless - 1955 or 1958? We think the petitioner was correct in claiming the bad debt deduction in 1955. Cf. Person Construction Company v. Commissioner, 116 F. 2d 94, 95 (C.A. 7, 1933). A debt deducted as worthless may be sued upon to reduce it to judgment without affecting the deduction. Redfiled v. Eaton, 53 F. 2d 693 (D.C. Conn. 1931); Charles Henry Mattlage, 3 B.T.A. 242 (1925). The debt may be presently worthless but the creditor may reduce it to judgment in order to take advantage of a longer period of limitation in the hope that he may subsequently collect it. The petitioner was not required to be an "incorrigible optimist" and a "bare hope" that something might turn up in the future is no sound reason for postponing the time for taking a deduction for a bad debt. Cf. L. B. Hirsch, 42 B.T.A. 566 (1940), affd. *173 124 F. 2d 24 (C.A. 9, 1941). No other events happened in any subsequent year except the mutual release signed in 1958 which terminated the lawsuit. Thus, even hindsight, which is always 20/20, confirms petitioner's judgment that the Murdock debt was worthless in 1955. We decide this issue for the petitioners. Issue 9. - Staiger Bonus In a letter to Carl Staiger dated April 3, 1957, from the company's accountant, it was stated: "Your account with N. P. Van Valkenburgh Co. reflects a balance of $7,900.00 due from you as of December 31, 1956." The letter asked Staiger to advise the accounting firm as to whether this balance was correct, and petitioner's signature at the bottom of the letter indicated that he approved the inquiry. Subsequently, on April 15, 1957, the petitioner advised Staiger by letter that the company was giving him a bonus of $7,900 for the year 1956. The amount in question originated as a loan to Staiger. Petitioner's business continued to treat it as an account receivable through April 3, 1957, even though Staiger had left petitioner's employment in July 1956. Thus it is clear that petitioner did not treat the $7,900 as a bonus rather than a loan *174 until after the letter to Staiger asking confirmation of its account receivable from him. Since petitioner's liability in the form of a bonus did not become fixed and certain until 1957, it cannot be deducted in the year 1956 when the contingency as to such liability remained. Cf. United States v. Anderson, 269 U.S. 422 (1926). We reject, as unsupported by the evidence, petitioner's contention that the letter of April 3, 1957, was never sent and that it treated the amount as a bonus rather than an account receivable as of December 31, 1956. We think the deduction of the bonus may be allowable in 1957, a year over which we have no jurisdiction in this case. Therefore, we sustain respondent's disallowance of the deduction for the year 1956. Issue 10. - Hughes Blades Transactions On November 28, 1955, the petitioners owned as community property 1000 shares of stock in Hughes Blades Inc. Petitioner had also loaned the corporation $7,966.55. By letter agreement dated November 28, 1955, petitioner agreed to sell both the stock and the loan to his brother-in-law, the president of Hughes Blades for $100. This was accepted and the consideration was paid. Petitioner concedes *175 that one-half of the loss on the sale of the Hughes Blades stock was properly disallowed since it was a loss on the sale of property between family members which is not deductible under section 267(a)(1). While the remaining one-half of the stock loss was not disallowed by respondent in his notice of deficiency, he now contends that this too should be disallowed as a sale between related parties which reflects a donative intent. With regard to such a new issue the respondent has the burden of proof. Sheldon Tauber, 24 T.C. 179 (1955). Petitioner testified that Hughes Blades had financial difficulties in 1955. The sale of the stock was evidenced by a formal written agreement. There was an exchange of consideration. In light of these factors, we find that respondent has not met his burden of proving a donative intent on the part of petitioner since his only evidence is an admission from petitioner that the fact that the transaction was entered into with his brother-in-law was a relevant consideration. Therefore, the petitioner is entitled to a capital loss equal to one-half of the loss on the sale of the stock. As part of the same transaction, petitioner sold a loan *176 owned to him by Hughes Blades to his brother-in-law. Since this indebtedness was community property of the petitioners, one-half of the loss on the sale was attributable to Elsie M. Van Valkenburgh's interest in the loan and thus not deductible under section 267(a)(1). However, as indicated above, the sale from petitioner to his brother-in-law appears to have been a bona fide sale. Consequently, we hold that the petitioner was entitled to a capital loss on his one-half interest in the loan. Issue 11. - Net Operating Loss Carryback Petitioners reported a net operating loss of $32,831.77 in their return for the year 1954. Respondent made certain adjustments to taxable income for 1954 and allowed the petitioners a net operating loss carryback of $1,721.69 in 1952. In view of the disposition made in this opinion of the other issues involved, the correct amount of the net operating loss carryback from 1954 to 1952 can be determined and given effect in the Rule 50 computation. Issue 12. - Addition to Tax Under Section 294(d)(2) Respondent determined additions to tax of $206.19 in 1951 and $1,228.31 in 1952 under section 294(d)(2), Internal Revenue Code of 1939, for substantial *177 underestimation of estimated tax. We have found that a part of the deficiency for these years was due to fraud with intent to evade tax and therefore this addition to tax is not barred by the staute of limitations. Section 294(d)(2) provides, in material part, that if 80 percent of the tax, in the case of individuals, exceeds the estimated tax, there shall be added to the tax an amount equal to the excess, or equal to 6 percent of the amount by which such tax so determined exceeds the estimated tax so increased, whichever is the lesser. Thus, if the computation under Rule 50 results in actual tax liability more than 80 percent in excess of the estimated tax, then the addition to tax will apply. Craig M. Smith, 33 T.C. 465 (1959), modified on other grounds 313 F. 2d 724 (C.A. 8, 1963). Issue 13. - Statute of Limitations Having determined that a part of the deficiency in each of the years 1950 through 1954 was due to fraud with the intent to evade tax, it follows that the assessment of deficiencies for such years is not barred by the statute of limitations. See section 276(a), Internal Revenue Code of 1939, and section 6501(c)(1), Internal Revenue Code *178 of 1954. The years 1955 and 1956 are open for assessment by consent. * * *
To permit all the necessary computations required of the parties to arrive at a decision reflecting the concessions made by them and the conclusions reached in this opinion, Decision will be entered under Rule 50. Footnotes
a1. The following abbreviations are used herein: N. P. = Petitioner, N. P. Van Valkenburgh S.B.M. = Shopping Basket Market located at 8431 State St., South Gate, California
Mrs. N. P. = Petitioner, Mrs. N. P. Van Valkenburgh ↩
a2. All checks endorsed by N. P. to J. R. were deposited by J. R. in his personal account.↩
a1. The following abbreviations are used herein: N. P. refers to Norman P. Van Valkenburgh J. R. refers to J. R. Van Valkenburgh, son of Norman P. Van Valkenburgh John refers to John Van Valkenburgh, brother of Norman P. Van Valkenburgh S.B.M. refers to Shopping Basket Market, 8431 State Street, South Gate, California. ↩
a1. a1 "Total Expenses" for 1950 and 1951 includes both direct and indirect "costs." In all other years only direct "costs" are included. ↩
a2. 1950 tax return refers to this item as "contracts partially completed." ↩
a3. This amount includes miscellaneous income of $2,219.25. ↩
a4. Direct profit before allocation of coadventurers' share. ↩
a5. Represents a contract fee.↩
1. Even if this were considered a hybrid accrual method, the petitioner would not be aided for he seeks to establish that no consistent method was used.↩