Home News Publishing Company v. Commissioner. Jay Morton and Blanche Morton v. Commissioner.
Home News Publishing Co. v. Commissioner
Docket Nos. 871-66, 872-66, 331-67.
United States Tax Court
T.C. Memo 1969-167; 1969 Tax Ct. Memo LEXIS 132; 28 T.C.M. (CCH) 834; T.C.M. (RIA) 69167; August 13, 1969, Filed Anthony F. Barone, 4400 Palm Lane, Miami, Fla., for *133 the petitioners. Richard G. Holloway, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: In these consolidated cases, respondent has determined the following deficiencies in petitioners' Federal income taxes: 835 *10 Name
Year End- ing
Deficiency
Additions to Tax Code [1]
Sec. 6651(a)
Sec. 6653(a)
Home News Publishing Co., Dkt. #871-66
2/29/60
$ 989.80
$1,078.98
Home News Publishing Co., Dkt. #871-66
2/28/62
21,579.55
Home News Publishing Co., Dkt. #871-66
2/28/63
6,047.93
302.40
Home News Publishing Co., Dkt. #871-66
2/29/64
440.84
$44.08
22.04
Jay and Blanche Morton, Dkt. #872-66
12/31/61
17,249.69
862.48
Jay and Blanche Morton, Dkt. #872-66
12/31/62
10,935.93
546.80
Jay and Blanche Morton, Dkt. #872-66
12/31/63
1,310.09
65.50
Jay and Blanche Morton, Dkt. #331-67
12/31/64
7,832.54
Jay and Blanche Morton, Dkt. #331-67
12/31/65
3,253.40
Concessions made by both parties will be given effect in a Rule 50 computation. No evidence was introduced in regard to a number *134 of issues raised by the petitions in the instant cases; nor were they discussed on brief. We now consider these issues as abandoned by the respective petitioners. Those issues upon which evidence was introduced, or which were discussed on petitioners' brief, are as follows: As regards Home News Publishing Company (hereinafter sometimes referred to as Home News): Whether petitioner's gross receipts included certain amounts received by an unrelated foreign corporation. Whether expenditures incurred in connection with certain equipment were capital in nature, subject to a depreciation deduction, or were currently deductible rental expenses. Whether certain amounts designated as commissions were actually incurred and, if so, whether they constituted deductible expenses of Home News. Whether additions to tax under section 6651(a) for the fiscal year ending in 1964, or under 6653(a) for the fiscal years ending in 1962, 1963 or 1964, are applicable. As regards Jay and Blanche Morton: Whether any amounts constituting Home News income were paid to petitioners as constructive dividends. The amounts of, and years when, various losses were incurred and whether such losses constituted *135 business bad debts, nonbusiness bad debts, long-term capital losses, or nondeductible personal expenses. Whether additions to the tax under section 6653(a) for the calendar years 1961, 1962 and 1963, are applicable. Our holdings on the above issues will determine whether petitioners are entitled to, and the amounts of, net operating loss carrybacks to the years 1961 and 1962; and will also determine the allowable medical expense deductions for the years 1964 and 1965. Findings of Fact Some of the facts have been stipulated and they are so found. Petitioner Home News Publishing Company is a Florida corporation having its principal place of business in Hialeah, Florida, at the time its petition in the instant case was filed and at all relevant periods. Its Federal income tax returns, using an accrual method of accounting, for the taxable years March 1, 1959 to February 29, 1960; March 1, 1961 to February 28, 1962; March 1, 1962 to February 28, 1963; and March 1, 1963 to February 29, 1964, were filed with the district director of internal revenue at Jacksonville, Florida. The return for February 29, 1964, was stamped received by the Internal Revenue Service on July 20, 1964. *136 Petitioners Jay and Blanche Morton (hereinafter referred to as Jay and Blanche, respectively), husband and wife, resided in Miami, Florida, at the time their petitions in the instant case were filed and at all other relevant times. Their joint Federal income tax returns for the calendar years 1961 through 1965, on the cash receipts and disbursements method of accounting, were filed with the district director of internal revenue at Jacksonville, Florida. Jay and Blanche together owned all of Home News outstanding stock during the years in issue and at the time of trial Jay was its president and Blanche its secretary. At all relevant times Home News was engaged in the publishing business. In 1961 Home News entered into an agreement with Caribbean Sales, Ltd. (hereinafter sometimes referred to as Caribbean Sales), under 836 which Home News would print publications for various periodicals which were located in Western Hemisphere countries or which were in exile from Cuba. At this time Caribbean was a registered corporation in Nassau, Bahamas, engaged in selling various products throughout the Western Hemisphere, and was unrelated to Home News. Its president was Jack Worth (hereinafter *137 sometimes referred to as Worth), until shortly after the corporation was sold to a group headed by James R. Hewitt (hereinafter sometimes referred to as Hewitt), at which time Hewitt became president. In 1961 Home News dealt with both individuals when each was president of Caribbean. After Hewitt became president, Worth remained with Caribbean and at times represented the corporation in its dealings with Home News. In large part the agreement existing between Home News and Caribbean Sales was oral. Under its terms Caribbean immediately referred one of its customers, El Avance publications of Havana, Cuba (hereinafter called Avance), a publication in exile operating out of Miami, Florida, to Home News for purposes of printing Avance's periodical. The referral of Avance was evidenced by almost identical letters, each dated March 25, 1961, and signed respectively by Worth and Hewitt, each signing as president of Caribbean Sales, Ltd., as follows: CARIBBEAN SALES, LTD. c/o P.O. Box 227 * Nassau Plaza Bldg. Nassau, N. P., Bahamas
Tel. 9-4684 March 25th 1961 Home News Publishing Co., Inc. Hileah, Florida, U.S.A.
Attention of Mr. Jay Morton President Dear Mr. Morton: *138 Confirming our previous negotiations relative to our handling and developing the foreign market for your publications, please be advised that we will endeavor to do so as your * foreign sales representative. We have transferred AVANCE publications of Havana, Cuba, to you. As you know they will continue their weekly newspaper from the United States in order to maintain a record of uninterrupted publication until such a time as they hope to again return to their homeland. We handle other interest of the principals of this organization and are most pleased that you can now be of service to them. The pilot program and tests that you have made with them are very satisfactory. Please bill us your cost of the weekly publications they are now running with you, and you will be promptly paid. We are also working toward other foreign language accounts for you. Sincerely yours, (S) Jack W. Worth President JWW/B Foreign Sales Specialists The parties also agreed that Home News would print, on an exclusive basis, whatever printing work Caribbean would have for referral. In return, any customers which Home News obtained and which emanated from a foreign source or foreign language *139 publication, would be given to Caribbean. As a result of the agreement Home News printed, inter alia, the following publications for Caribbean Sales: El Avance; Zig Zag; Accion; Cuba Libre; the Jamaican Diplomat, Trend, a West Indian or Jamaican publication; Frente a La Calle, a Puerto Rican publication; and the Nassau Herald. As a general practice, Home News would prepare a bill for printing on Caribbean's behalf and send that bill to the periodical as a bill from Caribbean. The customer would pay Caribbean the amount of the bill and Home News would then bill Caribbean for its printing costs (an amount less than the bill the customer had received). Though Caribbean was to immediately pay Home News upon its receipt of the customer's payments, there were a number of delays in Caribbean's payments to Home News which gradually caused friction between Caribbean and Home News' officers. One exception to the general billing procedure established by Home News and Caribbean was that followed with regard to Zig Zag. Zig Zag had not been recommended to Home News by Caribbean, but because 837 it was a foreign language publication Home News was required to assign the account to Caribbean. *140 Home News printed Zig Zag from July until approximately December 1962, during which time Zig Zag paid Home News and Home News remitted the amount received to Caribbean. Some of the checks for printing services rendered by Home News for Zig Zag were made directly payable to Caribbean. On or about March 10, 1961, Jay Morton received the following letter from Russell Hewitt as a result of a meeting with Jay in which Hewitt showed an interest in investing in the Florida Keys: J.R. Whitten-Hewitt Nassau Bahamas P.O. Box 1530 March 9th 61 Mr. Jay Morton 912 Ponce de Leon blvd., E. Coral Gables, Fla. Dear Mr. Morton: In accordance with our earlier discussions, I shall shortly open an account in your name in our Nassau branch of The Bank of Nova Scotia. From time to time, I shall be making deposits of my monies to the credit of this account. You will then have it readily available for such investments for me as you deem prudent and profitable. I shall have the bank authorities mail you the necessary signature cards and check book. You may keep me posted on your plans and furnish me with periodic accountings as time goes on. Sincerely yours /S/Russell Hewitt Subsequently *141 an account in Jay's name was opened with the Nassau Branch of the Bank of Nova Scotia, and by February 15, 1964, the account had a balance of $42,913.04. Jay did not make any deposits to the account and there is no evidence in the record as to whether he made any withdrawals. Sometime prior to February 22, 1964, Jay received the following letter from Hewitt: Nassau Bahamas
P.O. 1530 Feb 16th 64 RUSSELL HEWITT Mr. Jay Morton Bay Park Towers NE. 33rd st & Biscayne Bay
Miami Dear Jay I shall be requiring the funds that I have been maintaining in your name in The Bank of Nova Scotia. Will you please make arrangements at your earliest convenience to come here, bringing all records, checks and statements and close out the account. Sincerely yours /S/ Russell Hewitt Hewitt had previously told the Home News' accountant, William H. Jones, that the account was that of Hewitt's - even though in Jay's name. On February 22, 1964, the account was closed by Jay's writing a check for the balance of the account to Hewitt and Hewitt's cashing of the check. At the time the account was closed Hewitt paid $214.56 as a one-half percent withdrawal charge. In his statutory notices *142 of deficiency, respondent determined that the total amounts paid to Caribbean during the years in issue by Avance and Zig Zag constituted Home News' income, and further determined that the amounts paid by Avance magazine to Caribbean represented Home News' income which was constructively received by Jay and Blanche as dividend income. On January 16, 1961, Home News entered into a 39-month agreement with Equilease Corporation in the form of a lease, calling for Home News' lease of certain Freiden recording equipment. The agreement called for Home News to pay $835.68 initially as "prepaid rent" for the 37th, 38th and 39th months of the lease. The monthly rental during the remainder of the term was to be $278.56 per month. A rider attached to the agreement provided that upon the 39-month period's expiration Home News had the option of renewing the agreement for a period of five years at a rental of $180.30 per year and also had the option to purchase the equipment for $901.50, less 50 percent of the renewal rentals paid at the time the purchase was elected. The agreement further provided that the lessee had the risk of loss; the stipulated loss value being $9,015 for the first 12 months, *143 $6,000 for the next 12 months, and $3,000 thereafter. The lease further provided that the lessee was to pay for all taxes, electricity, fuel, supplies, insurance, and repairs and replacements. At the date of trial petitioner continued to use the equipment under the terms of the renewal provisions. On its Federal income tax returns, Home News included its payments to Equilease Corporation as rental expense deductions during each of the years in issue. In his statutory notice of deficiency respondent disallowed any deduction for rental expense 838 in respect of petitioner's payments under the agreement, determining them to be partial payments on the purchase price of the equipment. Considering the purchase price of the equipment to be $10,863.84, respondent allowed depreciation on the equipment using the straight-line method of depreciation over a 10-year life, or $1,086.38 for each year. On its Federal income tax returns Home News deducted $10,088.88, $5,347.02, and $1,007.11 as commissions for the fiscal years ending in 1962, 1963, and 1964, respectively. In his statutory notice of deficiency respondent disallowed the above amounts to the extent of $9,900, $5,027.33, and $417.88, *144 respectively. In his testimony at the trial Jay Morton stated that the amounts disallowed represented payments to J. Zayas, co-publisher of Avance magazine. In partial support of the deductions the following item signed by Zayas was received into evidence: July 2, 1962 This will acknowledge receipt of the following sums of cash which were in payment of commissions due me: Apr. 22, 1961
$ 100.00
Apr. 28, 1961
100.00
May 5, 1961
100.00
May 12, 1961
100.00
May 19, 1961
100.00
May 26, 1961
100.00
July 6, 1961
700.00
July 31, 1961
1,000.00
Sept. 1, 1961
1,400.00
Oct. 2, 1961
1,000.00
Nov. 3, 1961
1,100.00
Dec. 1, 1961
1,500.00
Jan. 3, 1962
1,200.00
Feb. 14, 1962
1,500.00
Mar. 8, 1962
1,200.00
Apr. 10, 1962
1,200.00
May 7, 1962
1,200.00
July 2, 1962
1,200.00 The above making a total sum of $14,800.00. /S/ J. Zayas No evidence was introduced to explain when the amounts Zayas purportedly received had accrued as liabilities of Home News, nor were any canceled checks or other supporting items introduced. Zayas had performed no services for Home News. Jay testified that he paid the amounts when Hewitt told him that the amounts were required *145 to be paid if Avance magazine was to remain an account of Home News. During the period 1961 through 1964, Jay loaned approximately $480,000 to William Dock. In addition, on July 17, 1963, he guaranteed a note of Dock's business, Bill Dock Cars and Service, Inc. In 1964, Jay and Blanche claimed a $116,778.60 business loss from "fraud or embezzlement" arising out of Jay's dealings with Dock. In 1966 petitioners obtained a judgment against Dock in the principal amount of $80,482.27 plus costs and interest. It is stipulated that the net uncollectible amount of such judgment was $81,473.10, and respondent determined (and petitioners now agree) that $1,665.71 of this amount represented life insurance premiums paid by Jay for insuring William Dock's life. On their amended 1964 return petitioners reduced their claimed fraud or embezzlement loss to $80,482.27, and also filed two Forms 843 and amended 1961 and 1962 returns, claiming net operating loss carrybacks to 1961 and 1962. In his statutory notice of a deficiency respondent determined that Jay suffered a nonbusiness bad debt loss of $79,807.39 (the $81,473.10 uncollectible amount less the insurance cost of $1,665.71), thus disallowing *146 any deduction for the insurance premiums paid. On August 31, 1965, the Circuit Court for Dade County, Florida, held that both Jay and Blanche were liable for the balance of the July 17, 1963, note of Bill Dock Cars and Service, Inc. Such judgment was appealed and Jay and Blanche posted a $40,900 appeal bond. On April 5, 1966, the District Court of Appeals for the Third Circuit affirmed the lower court decision and on April 29, 1966, the Mercantile National Bank, obligee of the not, acknowledged receipt of $39,937.25 representing the judgment of $38,433.59, plus interest of $1,503.66. On their Federal income tax return for 1965, Jay and Blanche deducted $32,195 as a business expense arising out of the judgment. In his statutory notice of deficiency, respondent determined the amount to be a nonbusiness bad debt in 1965. Jay testified that he thought that the 1964 Dock loss was possibly by "fraud or embezzlement" as Dock had used money loaned to him for business purposes to pay personal debts. Jay usually received a note when he made a loan, however, no evidence showing the terms of the Dock loans was introduced. Dock was a personal friend of his and Jay had loaned him money on numerous *147 occasions as a personal favor. He had even advanced trust funds to him on one occasion without prior authorization. Though the Dock losses were classified as business bad debts on Jay and Blanche's return for 1964 and 1965, Jay testified that 839 he did not characterize himself to be in the business of making personal loans to Dock. Jay testified that he made a number of loans to various individuals for profit. The records of these loans were not introduced into evidence nor do Jay and Blanche's income tax returns reveal any interest income from personal loans. During this period Jay was an officer in a number of banks and spent approximately two to two and one-half hours a day on both the bank's business and his own personal lending activities. No evidence was introduced as to the amount of time spent on making personal loans alone. In addition to the William Dock losses, Jay and Blanche deducted $5,672.87 labeled Don Carter loss as a 1965 business expense. The parties now agree that the Carter loss was $4,853.87, which respondent has allowed as a nonbusiness bad debt. No evidence was presented as to the nature of this loss. On October 22, 1965, Jay obtained the following *148 judgment in his favor in an action against Dixie Rent-A-Car System, Inc., in regard to a $10,000 escrow deposit: IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT OF FLORIDA IN AND FOR DADE COUNTY IN CHANCERY No. 65C4976 - Judge J./ Gwynn Parker Jay Morton, Plaintiff, - vs. - Dixie Rent-A-Car Sys- tem, Inc., a Florida corporation, Defendant ] Final Order and Judgment This Cause comming on to be heard before me on the Bill of Complaint filed herein by the Plaintiff, Jay Morton, and no Answer having been filed for and in behalf of the Defendant, Dixie-Rent-A-Car System, Inc., a Florida corporation, and a Default Judgment having been entered in this cause, and after due notice being given of the Final Hearing, and the Plaintiff, together with his attorney, being present in Court, and the Court being otherwise duly advised in the premises, it is thereupon ORDERED, ADJUDGED AND DECREED: 1. That the Plaintiff, Jay Morton, has proven the allegations of fraud contained in the Complaint. 2. That the sale of the corporate stock from the Defendant, Dixie-Rent-A-Car System, Inc., a Florida corporation, unto the Plaintiff, Jay Morton, is hereby rescinded. *149 3. That the Plaintiff, Jay Morton, do have and recover from the Defendant, Dixie-Rent-A-Car System, Inc., a Florida corporation, the sum of Ten Thousand and No/100 ($10,000.00) Dollars, the original payment made by the Plaintiff for the said stock. DONE AND ORDERED in Chambers at Miami, Dade County, Florida, this 22nd day of October, A.D., 1965. J. Gwynn Parker Circuit Judge Dixie was dissolved in bankruptcy and the above judgment was worthless in 1965. Jay had made the $10,000 deposit in part on the belief that his participation in Dixie would result in printing business for Home News, and also result in auto "fleet" coverage for an insurance agency in which Jay had an interest. On their 1965 Federal income tax return Jay and Blanche deducted the $10,000 loss as a business expense. In his statutory notice of deficiency, respondent determined the amount to be a longterm capital loss. On their 1965 return petitioners also deducted as business expenses legal and professional fees of $4,891.80, interest of $3,620.29, and an investigation fee of $500. With the exception of $181 of the amount shown as interest, respondent allowed these amounts as currently deductible nonbusiness *150 expenses. The $181 amount was determined to be a nonbusiness bad debt. Thus, the nonbusiness interest expense deduction was determined to be $3,439.29. No evidence was introduced as to these items. Jay and Blanche reported a net capital loss of $9,956.08 in 1964, of which $1,000 was deducted from their gross income, and $8,956.08 was carried over to 1956. In his statutory notice of deficiency, respondent made no adjustments of these amounts. Opinion The following discussion relates only to those issues raised by petitioners in their petition and upon which evidence was presented, or which were discussed in petitioner's brief. As previously stated, we 840 consider all other issues raised by the respective petitioners as abandoned, and with respect to them find and hold for respondent. The major issue for determination is whether Home News (at all relevant times solely owned by Jay and Blanche Morton) is to be charged with income for amounts received by Caribbean Sales Ltd. (an unrelated corporation) from Avance and Zig Zag magazines, and whether any of the amounts collected from Avance by Caribbean were subsequently paid to Jay and Blanche as constructive dividends from *151 Home News. Respondent argues that petitioners have failed to meet their burden of proof on this matter and consequently his determinations should be upheld. Unfortunately, on this issue (as well as the others) we have been frustrated in our deliberations by the failure of both parties to present evidence which could have better enlightened us as to the facts behind respondent's determinations and the specifics of Home News' and Jay Morton's dealings with Caribbean corporation. However, we find that the record before us is sufficient to support petitioners' contention that they are not chargeable with any additional income arising out of Home News' and Jay's relationship with Caribbean Sales. Respondent first contended that Caribbean Sales was a mythical corporation, but the evidence clearly indicates otherwise and respondent now concedes that such a company exists. The testimony of Jack Worth, a former president and employee of Carribbean Sales, and Jay Morton, supported by Home News' records showing dealings with Caribbean, further established that the two corporations had entered into a bona fide arm's length agreement in regard to who owned and controlled various client's *152 business and who had the right to print foreign source and foreign language periodicals. Both men testified that periodic disputes would arise over the fees which Home News charged Caribbean and Caribbean's delays in payment, a situation consistent with an arm's-length dealing. Though we did not necessarily find Jay the most candid witness, his testimony in conjunction with the other evidence presented has persuaded us that Home News' agreement with Caribbean was as he testified; i.e., that all foreign language accounts would belong to Caribbean Sales in return for Home News having the exclusive right to all of the printing business obtained by Caribbean Sales. The parties have stipulated that Home News' billings to foreign language publications were made on Caribbean Sales' forms and the evidence introduced into the record indicates that the agreement was substantively carried out in the agreed manner, with remittances coming through Caribbean. Even respondent's witness, Jose Hernandez Torano, president of Zig Zag, testified that at least some checks for printing work done by Home News were made payable to Caribbean Sales. Respondent relies heavily on the existence of the bank account *153 in Jay's name with the Nassau branch of the Bank of Nova Scotia as strong evidence that Caribbean Sales and Jay were engaged in a conspiracy to convert Home News income from Avance into disguised dividends to the Mortons. However, there is no evidence in the record which correlates any deposit to that account with any payments made by Avance. Jay testified that the account was set up so that he could make investments for Russell Hewitt (president of Caribbean sales), on short notice and a letter to Jay from Hewitt written in conjunction with the establishment of the account is consistent with Jay's testimony. Though the account was closed out under somewhat suspicious circumstances (at about the same time as an Internal Revenue Service agent's first contact with Jay) the funds in the account were returned to Hewitt, not Jay. Unfortunately, Russell Hewitt was not present at trial to further explain Caribbean Sales and his dealings with Jay and Home News. Respondent would have us find that this absence is fatal to petitioner's case Certainly petitioner's case is not strengthened by Hewitt's absence, but the fact that Hewitt apparently resides in Nassau makes us reluctant to find his *154 absence particularly suspicious. It must be remembered that on this issue, petitioners are being required to prove a negative, i.e., that they did not have income, and although the question is a close one, we believe, on the basis of the entire record, that petitioners have carried their burden of proof. We find and hold therefore, that the questioned amounts paid by Avance and Zig Zag for printing constituted income of Caribbean, not that of Home News, and that no amounts from such payments were paid to or on behalf of Jay Morton by chung nam hee 841 Caribbean or Russell Hewitt as dividends, constructive dividends, or any other type of taxable income. With the exception of the additions to tax, the remaining issues concern deductions taken by the respective petitioners but disallowed by respondent. For the fiscal years ending 1962, 1963, and 1964, Home News deducted as a rental expense under section 162[2] of the Code all amounts paid pursuant to a lease with Equilease for the use of recording equipment. Respondent determined that the payments constituted a portion of the equipment's purchase price, disallowed petitioner's claimed deduction, and allowed a depreciation deduction *155 in its stead. The only evidence presented on this matter was the lease itself and its provisions fully support respondent's determination. The agreement placed all risk of loss and liability for expenses on Home News, stipulating a loss value of $9,015 for the first year. At the end of 39 months petitioner had the right to purchase the property for only 10 percent of its original stipulated loss value or $901.50. Alternatively, petitioner had the option to rent the property for approximately $15 per month (as compared to $278 per month for the first 39 months) with 50 percent of such rent to apply toward the purchase *156 price. It is well settled that an agreement, though drafted in the terminology of rent, will be treated as a conditional sales contract if the taxpayer has acquired or will acquire an equity in the property. Chicago Stoker Corporation, 14 T.C. 441 (1950); D. M. Haggard, 24 T.C. 1124, affd. 241 F. 2d 288 (C.A. 9, 1956); Ersel H. Beus, 28 T.C. 1133 (1957), affd. 261 F. 2d 176 (C.A. 9, 1958). Here the terms of the agreement clearly provided an arrangement whereby the taxpayer's rental payments virtually paid for, and gave petitioner the right to clear title to the property by the end of 39 months. Since the equipment's useful life was obviously much longer, as is evidenced by the fact that it was still in use in May 1968, we sustain respondent's determination that the payments made under the agreement were nondeductible capital expenditures. See Quartzite Stone Co., 30 T.C. 511 (1958), affd. 273 F. 2d 738 (C.A. 10, 1959); Mt. Mansfield Television, Inc. v. United States, 239 F. Supp. 539 (D. Vt. 1964), *157 affd. 342 F. 2d 994 (C.A. 2, 1965), certiorari denied 382 U.S. 818. [3] Also, in the absence of any evidence to the contrary, we uphold respondent's determination of allowable depreciation on the equipment.
On its Federal income tax returns for the fiscal years ending 1962, 1963, and 1964, Home News deducted as commission expense certain alleged payments to Zayas, president of Avance magazine. Respondent disallowed those amounts as unsubstantiated. As shown in the findings of fact, the evidence as to these payments is quite meager. There is a receipt on a blank piece of paper signed by Zayas and showing an amount which does not correlate with any yearly deduction taken by Home News for the purported payments. In addition there is Jay's vague testimony that the payments were required to keep the Avance magazine account. Such evidence is wholly insufficient to establish that the amounts claimed were spent or that any payments which were made constituted ordinary and necessary expenditures under section 162 of the Code. Even assuming, arguendo, that the expenditures were made, *158 and that they were made in connection with Home News' business, there is still no evidence as to when the expenses accrued. Home News' returns reported income on an accrual basis, not cash, and in the absence of evidence as to the fiscal period to which the claimed expense relates, the record is incomplete. For the above reasons we find and hold that petitioner is not entitled to any deduction for commission expense in excess of that determined by respondent. On their 1964 and 1965 returns Jay and Blanche deducted a number of items as business deductions. Their returns did not disclose the nature of the business in which these deductions were purportedly incurred. Included were certain losses supposedly 842 incurred in Jay's asserted "business of lending money" to various individuals. With the exception of the amount paid on petitioners' guarantee of the Bill Dock Cars and Service, Inc., obligation, the amounts involved are no longer in dispute and, in his statutory notice of deficiency, respondent allowed these losses as nonbusiness bad debts. Respondent's determination, however, in effect denies petitioners a current deduction for all the losses in issue, since *159 nonbusiness bad debts are treated as shortterm capital losses and are currently deductible only from long-term capital gains, plus a maximum of $1,000. [4] Petitioners' losses from bad debts and the other items remaining in dispute are in excess of the currently allowable deductions. *160 The only evidence introduced as to Jay's "business" was testimony to the effect that Jay had made a number of loans over the years to various individuals and that Jay was an officer in some banks. The best evidence of Jay's loan activities lay in a "little black book" in which Jay purportedly recorded all of his loan arrangements; but petitioners saw fit not to introduce this record into evidence. As stated in the findings of fact there was no evidence as to any amount of interest income Jay received from his loan transactions, the terms of the loans, or the amount of time Jay specifically devoted to his personal lending activities as opposed to time spent on the business of the banks he was associated with. Jay testified that he spent approximately two to two and one-half hours daily on both his banking and loan activities, however, he did not differentiate, and it is obvious that whatever time he spent on bank business cannot be considered spent on his individual loan business as the two are not necessarily a part of the same business. Cf. W. A. Dallmeyer, 14 T.C. 1282 (1950). Jay's testimony indicated that he made loans more as a personal favor to friends rather *161 than as a part of a money-lending business, and we so hold. In the case of William Dock, to whom Jay loaned close to half a million dollars, it appears that Jay put Dock's friendship ahead of good business practices. Jay even testified that at one point he violated the provisions of a certain trust to advance money to Dock that he was not authorized to receive. Further, in light of the lack of any copies of the notes Dock signed or corroborating testimony from Dock (who was present during the trial, but not called by petitioners) as to any condition attaching to the loans, we cannot accept petitioners' characterization of the Dock loss as one from "fraud or embezzlement." The utter lack of evidence concerning the Carter loss requires us to accept respondent's characterization of that item. Consequently, we uphold respondent's determinations that Jay's loss on loans to Dock, his loss on a guarantee of the note of Bill Dock Cars Service, Inc., and the Carter loss constituted nonbusiness bad debts. Cf. Max M. Barish, 31 T.C. 1280, 1286 (1959); H. Beale Rollrns, 32 T.C. 604, 613 (1959), affd. 276 F. 2d 368 (C.A. 4, 1960); Ferguson v. Commissioner, 253 F. 2d 403, 406 *162 (C.A. 4, 1958), affirming 28 T.C. 432 (1957). This finding makes it unnecessary to discuss respondent's alternative argument that petitioners' loss on the guarantee of the Bill Dock Cars and Services, Inc., note was not allowable as a deduction in any event until 1966, the year the judgment was satisfied. Also, since the amount constituted a nonbusiness bad debt (which, as discussed, supra, is currently nondeductible), we do 843 not decide the amount of any loss incurred in 1965 from the guarantee. [5]
Our finding that the Dock losses were nonbusiness bad debts requires that we find that the life insurance *163 premiums which Jay paid on Dock's life represent nondeductible expenditures. We note parenthetically that no evidence was introduced as to the type of policy involved (i.e., whether the policy was a term policy or had a cash surrender value), or whether the policy proceeds were to reduce Dock's debt or merely represented an unrelated speculative investment of Jay's. But even if such evidence were in the record, petitioners could not prevail, as life insurance premiums on nonbusiness bad debts are not considered deductible expenditures but are wholly capital in nature. See Estate of Frank Hall, 17 T.C. 20 (1951); United States v. Mellinger, 228 F. 2d 688 (C.A. 5, 1956). Also, cf. Warren Leslie, Sr. 6 T.C. 488 (1946); James G. Whitaker, 34 T.C. 106 (1960). We thus uphold respondent's determination on this issue. On their 1965 income tax return Jay and Blanche deducted as a business expense $10,000 representing a loss they incurred in connection with Jay's $10,000 escrow deposit to Dixie Rent-A-Car. Though petitioners' brief is particularly *164 vague as to the theory under which this loss represents a business deduction, testimony at trial was to the effect that the money was paid for the purpose of obtaining printing business for Home News and insurance business for an agency in which Dock had an interest. The judgment against Dixie entered in Jay's favor (reproduced in the findings of fact) indicates that the deposit was for capital stock of Dixie and, since no evidence was introduced to the contrary, we find that the escrow deposit was for the purchase of Dixie stock. In the absence of evidence explaining why the stock was to be purchased by Jay and not Home News or the insurance agency, or evidence that the purchase was made solely for Home News or the insurance agency's benefit, we cannot find that the escrow deposit constituted an ordinary and necessary business expenditure on the part of Jay. Even if the amount was solely for the purposes Jay stated, the evidence presented is too vague to establish that the purchase of this capital asset could be considered entered into as an integral part of the ordinary course of either organization's business so as to qualify for ordinary, as opposed to capital, loss treatment. *165 Cf. Hollywood Baseball Association, 49 T.C. 338, 344 (1968), on appeal (C.A. 9, April 8, 1968), and the cases cited therein; and cf. Charles W. Steadman, 50 T.C. 369 (1968), on appeal (C.A. 6, January 3, 1969). We thus find and hold that petitioners have failed to show that the Dixie Rent-A-Car transaction was other than a personal, nonbusiness capital investment. Whether respondent's characterization of the loss as a capital loss is correct or whether the loss represents a nonbusiness bad debt loss, we need not decide, as the result is the same under either characterization on the facts of the instant case. Similarly we need not decide whether respondent properly classified amounts of $4,891.80, $3,439.29, and $500 in 1965 as nonbusiness deductions since the amounts were allowed and under petitioner's circumstances the classification of the expenditures is immaterial. Respondent determined that $181 deducted as interest expense in 1965 was in fact a nonbusiness bad debt. No evidence was introduced regarding this issue and we consequently uphold respondent's determination. Respondent determined that Home News was liable for the delinquency penalty *166 under section 6651(a)[6] of the Code for the fiscal year ended February 28, 1964, Section 6072 (b)[7] of the Code provides that corporation 844 returns must be filed on or before the 15th day of the third month following the close of the corporation's fiscal year. Home News' fiscal year ended February 28, 1964, and consequently its return for that year was due May 15 of that year. The return for the fiscal year ending February 28, 1964, was stamped received by the Internal Revenue Service on July 20, 1964. That date is presumptively correct (cf. Thomas N. Perkins, 33 B.T.A. 606, 616 (1935)), and in the absence of any evidence to the contrary or evidence showing that failure to timely file was due to reasonable cause and not willful neglect, we uphold the applicability of the penalty. *167 Respondent also determined that Home News is liable for the negligence penalty under section 6653(a) of the Code [8] for the fiscal years ending 1962, 1963, and 1964, and that petitioners, Jay and Blanche, were liable for the same penalty for the calendar years 1961, 1962, and 1963. No evidence was presented on this issue. Since respondent's determination on this issue is presumptively correct, we find the respective petitioners liable for such penalties. Leroy Jewelry Co. 36 T.C. 443, 445 (1961). Decisions will be entered under Rule 50. Footnotes
1. All references to the Code are to the Internal Revenue Code of 1954.↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * * (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩
3. Also see Norma P. Van Valkenburgh, T.C. Memo. 1967-162↩.
4. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly Worthless Debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * * (d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. SEC. 1211. LIMITATION ON CAPITAL LOSSES. * * * (b) Other Taxpayers. - In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the taxable income of the taxpayer or $1,000, whichever is smaller. * * *↩
5. Both petitioners and respondent have included the interest on the judgment paid to Mercantile in 1966 as part of petitioners' loss on the guarantee. Even if this amount is to be treated separately from the loss, it seems clear that it could not be deducted until 1966 as petitioners are on the cash basis. The only amount paid in 1965 was the purchase of an appeal bond, which by itself is not sufficient to constitute a transfer to provide for the satisfaction of an asserted liability. See section 1.461-2 (c)(1), Income Tax Regs.↩
6. SEC. 6651 * * * (a) * * * In case of failure to file any return required under authority of subchapter A of chapter 61 (other than part III thereof) * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate. ↩
7. SEC. 6072. TIME FOR FILING INCOME TAX RETURNS. * * * (b) Returns of Corporations. - Returns of corporations under section 6012 made on the basis of the calendar year shall be filed on or before the 15th day of March following the close of the calendar year, and such returns made on the basis of a fiscal year shall be filed on or before the 15th day of the third month following the close of the fiscal year.↩
8. SEC. 6653 * * * (a) * * * If any part of any underpayment * * * of any tax imposed by subtitle A * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩