JACK AND MARTA BISSEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bissey v. Commissioner
Docket No. 5039-92
United States Tax Court
T.C. Memo 1994-540; 1994 Tax Ct. Memo LEXIS 549; 68 T.C.M. (CCH) 1056; October 27, 1994, Filed *549 Decision will be entered under Rule 155. Jack E. Bissey, pro se. For respondent: Mary Schewatz. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined a deficiency of $ 60,679 in petitioners' 1988 Federal income tax and additions to tax of $ 3,034 under section 6653(a)(1) and $ 15,170 under section 6661. Unless otherwise identified, section references are to the Internal Revenue Code in effect for 1988, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions by the parties, the issues remaining for decision are: (1) Whether petitioners are entitled to deduct any part of the $ 90,000 long-term capital loss they claimed on the transfer of a videotape rental business; (2) whether petitioners realized $ 5,352 of gain on the sale of rental real property that they are required to treat as ordinary income under section 1250 (section 1250 gain); (3) whether petitioners are liable for an addition to tax under section 6653(a)(1) for negligence; and (4) whether petitioners are liable for an addition to tax under section 6661 for substantial understatement of income tax. We hold that petitioners are not entitled *550 to deduct any loss on their transfer of the videotape rental business, that petitioners have no section 1250 gain, and that they are liable for additions to tax under sections 6653(a)(1) and 6661. FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. The stipulations of fact and attached exhibits are incorporated herein. Petitioners resided in Whittier, California, when they filed the petition in this case. Petitioners were married and properly filed a joint return for the year at issue, but were divorced when they filed the petition. Movietime Video Store
In June 1983, petitioners started Movietime, a videotape rental business. During 1983, petitioners purchased the original library of videotapes for Movietime at a cost of approximately $ 40,000. Petitioners thereafter used Movietime's cash-flow to continually update the library, and at some time prior to 1988, petitioners used the proceeds of a loan secured by a third title deed on their house to purchase a large number of tapes for the library. The average cost of the 3,000-odd tapes purchased by petitioners during the years 1983-88 was approximately $ 45 per tape. Petitioners also purchased *551 counters, shelves, cash registers, signs, an alarm system, and other miscellaneous items for Movietime. Petitioners operated Movietime in a rented store. The depreciation schedules included in petitioners' 1983 and 1984 returns show petitioners' monthly purchases of videotapes and that petitioners claimed straight-line depreciation, over a 4-year useful life, on the videotapes. Petitioners' depreciation schedule for 1983 shows an initial basis of $ 47,725, 6 months' depreciation of $ 5,615, and a yearend adjusted basis of $ 42,110. Petitioners' depreciation schedule for 1984 shows an unadjusted basis of $ 71,758, depreciation of $ 15,655, and a yearend adjusted basis of $ 50,509. Petitioners' 1985, 1986, and 1987 returns did not include depreciation schedules or show the cost of new tape purchases or adjusted basis of the tapes for those years. Instead, the total amount of depreciation claimed for that year is shown on the Movietime Schedule C. Depreciation reported and allowed for 1985, 1986, and 1987 was $ 28,261, $ 33,417 and $ 35,088, respectively. Petitioners' returns for the years 1983-88 show total depreciation of $ 118,124 for the video store. The Movietime Schedule *552 C showed a profit before depreciation deductions for each of the years 1983-87, but a net loss after depreciation deductions for each year other than 1984. Petitioners did not provide respondent with or seek to introduce into evidence any books or records to substantiate their purchases and costs of Movietime assets, other than copies of their income tax returns. In January 1988, petitioners transferred the Movietime assets to Marta's parents, Francisco and Margaret Meza. Petitioners' 1988 Federal income tax return reported a basis in the video store of $ 90,000 and an amount realized of zero, and a long-term capital loss from the transfer of the Movietime assets of $ 90,000. That reported loss offset $ 80,000 of capital gain that petitioners reported from the sale of two parcels of real property held for rental purposes. In consideration of the transfer of Movietime, the Mezas orally assumed, or took subject to, petitioners' remaining lease obligation on the store, which amounted to $ 595 per month for 16 months. On their 1988 and 1989 Federal income tax returns, the Mezas reported a carryover basis of $ 29,026 in the Movietime equipment and videotapes and reported that Movietime *553 had profits before depreciation deductions. Loumont Property Transaction
Jack was previously married to Carol J. Bissey, who died on August 7, 1980. In 1971, Jack and Carol paid $ 38,000 for real property at 13434 Loumont Street, Whittier, California (Loumont property), which they held as community property. On August 7, 1980, the fair market value of the Loumont property was $ 125,000, and Jack inherited Carol's community property interest therein. Jack allocated $ 90,000 of the Loumont property fair market value to the building, which he elected to depreciate using the 125-percent declining balance method and a 20-year useful life. For 1983 through 1988, petitioners were allowed depreciation deductions totaling $ 20,340 on the Loumont property building. In February 1988, Jack sold the Loumont property for $ 133,106; the parties have stipulated that petitioners realized a long-term capital gain of $ 36,031 on the sale. OPINION Issue 1: Movietime
Petitioners reported a long-term capital loss of $ 90,000 from the transfer of the Movietime assets to the Mezas. Respondent disallowed the loss in full, relying on the following grounds: The Mezas and petitioners were *554 related taxpayers under section 267; the transfer was not a bona fide sale; and petitioners failed to substantiate their adjusted basis in the Movietime assets at the time of transfer. Petitioners have conceded that one-half of the loss from the transfer of Movietime was properly disallowed as a sale between related taxpayers under section 267. See Van Valkenburgh v. Commissioner, T.C. Memo. 1967-162 (section 267 disallows one-half of loss realized by spouses on sale of community property to a purchaser who is related to one of the spouses). Although petitioners concede that Van Valkenburgh is authority for disallowance under section 267 of one-half of their claimed loss, they argue that it supports their deduction of the other one-half of their loss. In Van Valkenburgh, we did hold that the taxpayer was entitled to deduct a capital loss equal to one-half of the loss realized on the sale. However, petitioners' reliance on Van Valkenburgh is misplaced. The second issue in Van Valkenburgh was new matter raised in the answer, and therefore the Commissioner had the burden of proving the lack of a bona fide sale, a burden that the Commissioner *555 failed to carry in that case. In this case, however, the burden of proof is on petitioners. Rule 142(a). Petitioners' reliance on Van Valkenburgh does not satisfy their burden of providing probative evidence that their transfer of Movietime was a bona fide sale. Section 1.267(a)-1(c), Income Tax Regs., reflects general principles of tax law that a loss is not regarded as realized, regardless of the relationship of the transferor and transferee, if the transfer of property was not bona fide. See Higgins v. Smith, 308 U.S. 473 (1940); DuPont v. Commissioner, 118 F.2d. 544 (3d Cir. 1941), affg. 37 B.T.A. 1198 (1938). The regulation draws upon the legislative history of the statutory predecessor of section 267, section 24(a)(6) of the Revenue Act of 1934, ch. 277, 48 Stat. 680, 691, as amended by the Revenue Act of 1937, ch. 815, sec. 301, 50 Stat. 813, 827, which made clear that the provision was enacted against the background of those principles: This provision of existing law is not exclusive and the Government may still deny losses in the case of sales or exchanges not specifically *556 covered thereby (for instance, between uncle and nephew) if such sales or exchanges are not bona fide. * * * However, as in the case of the provisions of existing law, it is not intended by this amendment to imply any legislative sanction of claiming deductions for losses on sales or exchanges in cases not covered thereby, where the transaction lacks the elements of good faith or finality, generally characterizing sales and exchanges of property. [S. Rept. 1242, 75th Cong., 1st Sess. (1937), 1939-1 C.B. (Part 2) 703, 722-723.]
Evidence that petitioners negotiated for and received the best price available would be probative that their transfer of Movietime was a bona fide sale. Transport Manufacturing & Equip. Co. v. Commissioner, T.C. Memo. 1968-190, affd. per curiam 431 F.2d 729 (8th Cir. 1970). In Transport Manufacturing & Equip. Co., we disallowed a loss claimed on a transfer between commonly controlled corporations -- which were not related taxpayers under section 267 -- where the sale price appeared to be artificially low and the transaction could not reasonably have been at arm's *557 length. The teaching of Transport Manufacturing & Equip. Co. is that in cases such as this, where the taxpayers have the burden of proof, they must show, if the loss is to be allowed as having actually been sustained and realized, that they attempted to obtain the best price available, and that the sale served some sensible business purpose. We cannot ascertain whether a price is sufficient if there is no evidence of what an arm's-length price would have been. Because petitioners offered no evidence of the fair market value of the store or the tapes at the time of transfer, we cannot ascertain on the record in this case whether the price petitioners received was an arm's-length price or whether petitioners' decision to transfer Movietime to the Mezas was dictated by family considerations. Jack's testimony and petitioners' only argument in support of their claim that the transfer was a bona fide sale seems to be that Movietime was draining petitioners financially and that nobody was willing to pay anything for the store. The only takers on this bleak horizon, the argument follows, were the Mezas, who were willing to take over Movietime and relieve petitioners of their burdensome *558 lease obligation. Petitioners did not show that they made any attempt to recoup their costs in the assets of Movietime or to realize its going concern value except by transferring the store and all its assets to the Mezas in return for their oral assumption of, or taking subject to, the Movietime lease. [1] In the absence of any evidence, other than Jack's self-serving, conclusory testimony, that no one was willing to pay anything for Movietime other than to take over the lease obligation, we have no satisfactory basis for finding that there was a bona fide sale. *559 In addition to a lack of evidence of arm's-length negotiations or a bona fide sale, the Mezas took a directly contrary position on their Federal income tax returns. They reported the transfer of the Movietime assets as a gift and not as a bona fide purchase and sale. [2]Under section 1012, the basis of a purchased asset is its cost, whereas under section 1015, the basis of a gift is the lower of its fair market value or the transferor's basis. The Mezas' 1988 and 1989 returns show that they used petitioners' adjusted basis in the assets of Movietime as their initial basis in the Movietime assets. The Mezas calculated depreciation on the Movietime assets using $ 29,026 of carryover basis. If we allowed petitioners' claimed loss in this case, both the Mezas and petitioners would be allowed deductions with respect to the same assets without any corresponding outlay by the Mezas. Not only have petitioners failed to show a bona fide sale, but the Mezas' treatment of the transfer as a gift for income tax purposes directly contradicts petitioners' claim that the transfer was a bona fide sale. *560 Petitioners have not met their burden of proving that the transfer to the Mezas was a bona fide sale. Because petitioners have not shown that they realized a loss on their disposal of the Movietime assets, any loss inherent in petitioners' unrecovered basis in those assets is disallowed. Disallowance of the loss on this ground makes it unnecessary to determine petitioners' adjusted basis in the Movietime assets for this purpose, although, for the reasons set forth infra pp. 17-18, the fact that petitioners' adjusted basis for the Movietime assets was much less than they claimed on their 1988 return does bear on their liability for the negligence addition to tax. Issue 2: The Loumont Property
Paragraph 10 of the stipulation of facts, as drafted by respondent's counsel and proffered to petitioners, stated: "The parties stipulate that petitioners had an ordinary gain of $ 5,352 under I.R.C. section 1250 in 1988". The parties crossed out the typed word "stipulate" and replaced it with the handwritten word "dispute" and initialed the change, so that it reads: "The parties dispute that petitioners had an ordinary gain of $ 5,352 under I.R.C. section 1250 in 1988." We are *561 not sure whether the parties are disputing the amount of gain, the character of gain, or both. Our uncertainty stems in part from the interrelationship of the amount of gain treated as section 1250 gain and the amount treated as long-term capital gain. The amount of long-term capital gain depends on the total gain and whether any part of the total gain should be characterized as section 1250 gain. However, in paragraph 8 of the stipulation of facts, the parties stipulated that "the correct long-term capital gain on the Loumont property is $ 36,031.00". The parties have not provided any schedule or explanation of how the stipulated long-term capital gain relates to the disputed section 1250 gain. We disregard a stipulation with "some trepidation and concern", Teller v. Commissioner, T.C. Memo. 1992-402; Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1547 (9th Cir. 1987) (stipulations are generally enforced unless manifest injustice would result), affg. T.C. Memo. 1986-23, and only do so if the stipulation is contrary to the clear weight of the evidence, Figgie Intl., Inc. v. Commissioner, T.C. Memo. 1985-369, *562 affd. 807 F.2d 59 (6th Cir. 1986). Respondent's counsel drafted the stipulations in this case, but has not addressed the ambiguity resulting from the "dispute" over the section 1250 gain. See Weagley v. Commissioner, T.C. Memo. 1991-235 (drafter bears the risk of ambiguity). So as not to disturb the amount of long-term capital gain stipulated in paragraph 8, which is not contrary to the clear weight of the evidence, we will treat any change in the amount or character of section 1250 gain as having the same effect on the amount of total gain; if we conclude there is no section 1250 gain, we will not delve into whether there is any long-term capital gain in addition to the stipulated amount. In the statutory notice, respondent determined that a portion of the gain on the sale of the Loumont property was section 1250 gain. Respondent determined that petitioners had a total gain of $ 133,106 on the sale of the Loumont property, of which $ 119,726 was long-term capital gain and $ 13,380 was section 1250 gain. The statutory notice of deficiency shows that, when respondent originally determined petitioners' gain from the sale *563 of the Loumont property, respondent used Jack and Carol's original cost as petitioners' unadjusted basis, rather than the fair market value at the time of Carol's death. Because Jack and Carol held the Loumont property as community property, each having a one-half interest, and Jack inherited Carol's community interest in the Loumont property upon her death, section 1014(b)(1) and (6) treats Jack as if he had acquired the entire property from Carol at her death. Just as a decedent's adjusted basis at the time of death has no bearing on a devisee's basis, so too, the adjusted basis of the Loumont property immediately prior to Carol's death has no bearing on Jack's basis in the Loumont property after her death. If the adjusted basis prior to death has no bearing on the postdeath basis, then too, any depreciation allowed on the property prior to death has no bearing on the postdeath basis of the property and cannot be included in the computation of section 1250 gain on a postdeath sale of the property. The parties stipulated that "the correct long-term capital gain on the Loumont property is $ 36,031.00." Although respondent apparently took petitioners' stepped-up basis under section *564 1014 into account when arriving at the stipulated amount, respondent does not appear to have taken petitioners' stepped-up basis into account when arriving at the disputed section 1250 gain of $ 5,352. Respondent, in her brief, showed how she arrived at the $ 5,352 of section 1250 gain from the $ 13,380 determined in the statutory notice. [3] Respondent, however, has never informed us how she arrived at the $ 13,380 excess depreciation figure, which was the amount of section 1250 gain shown on the statutory notice. Instead, respondent relied on the presumption of correctness of the statutory notice, notwithstanding that she conceded not only that the long-term capital gain determined in the statutory notice was incorrect, but that the correct amount of gain was substantially less than reported on petitioners' return. *565 Section 1250 provides that when depreciable real property is sold or exchanged at a gain, the transferor may be required to treat as ordinary income all or part of the gain to the extent depreciation deductions exceed straight-line depreciation. To determine the amount of petitioners' gain to be treated as section 1250 gain, we consider only the allowed or allowable depreciation after Carol's death. Section 1250 therefore applies in this case only if the depreciation allowed or allowable under the 125-percent declining balance method from August 1980 through February 1988 exceeds the depreciation that would have been allowed for the same period under the straight-line method. By reason of Carol's death in August 1980, Jack is treated under section 1014 as having acquired the entire Loumont property with a fresh-start basis at that time. We are therefore concerned with depreciation only from August 1980 forward. If petitioners can establish that the depreciation allowed as a deduction for any year was less than the amount allowable for that year, the section 1250 gain is to be calculated using the depreciation allowed. Sec. 1250(b)(3). Petitioners' tax returns for 1983-88 provide *566 sufficient evidence of the depreciation allowed for those years, and we will use the allowed depreciation for 1983-88. However, petitioners provided no records or evidence of the depreciation allowed for the last 5 months of 1980 and the full years 1981 and 1982, and so we will use the allowable depreciation for those years. Jack elected to depreciate the Loumont property under the 125-percent declining balance method over a 20-year useful life, and his depreciable basis was $ 90,000. For the period from August 1980 through December 1982, petitioners' allowable depreciation was as follows: Aug. - Dec. 1980
[1] $ 2,344
1981
[2] 5,478
1982
[3] 5,136
12,958
Adding that sum to allowed depreciation of $ 20,340 for 1983-88, the total depreciation allowed or allowable on the Loumont property from August 1980 through February 1988 was $ 33,298. Straight-line depreciation on the Loumont property from August 1980 through February 1988 would have *567 totaled $ 33,750. [4] Jack, although using a 125-percent declining balance method, apparently claimed depreciation amounting to $ 452 less than would have been allowable under the straight-line method. [5] Petitioners did not claim depreciation deductions in excess of straight-line depreciation and thus there is no excess depreciation to treat as section 1250 gain. As previously stated, we do not disturb the amount of long-term capital gain agreed to by the parties in paragraph 8 of the stipulation of facts. Issue 3: Additions to Tax
(a) Sec. 6653 -- Negligence
Respondent determined an addition to tax under section 6653(a)(1), which imposes an addition equal to 5 percent of the underpayment *568 that is due to negligence or intentional disregard of rules and regulations. Negligence is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do in a similar situation. Neely v. Commissioner, 85 T.C. 934, 947 (1985). In determining whether the taxpayer was negligent or intentionally disregarded rules and regulations, we consider his experience and knowledge. DeRochemont v. Commissioner, T.C. Memo. 1991-600. Petitioners' sole argument against the negligence addition is that it was reasonable for them, with their lack of experience and knowledge of the tax laws, to be unaware of Van Valkenburgh v. Commissioner, T.C. Memo. 1967-162. Even if we grant that the tax laws applicable to petitioners' transactions were complex, and that petitioners should not be expected to know about Van Valkenburgh, petitioners' argument lacks merit for a reason independent of our conclusion that petitioners' situation is distinguishable from Van Valkenburgh. The addition to tax for negligence has been held proper in cases where there is a total absence of objective *569 support for the amounts claimed on a return. Parker v. Commissioner, 86 T.C. 547, 565 (1986); Fraley v. Commissioner, T.C. Memo. 1993-304. We find, in any event, that petitioners' deficiency is due to negligence because, even if section 267 or general principles of tax law requiring a bona fide sale did not result in the disallowance of the entire loss, petitioners grossly overstated their adjusted basis in the Movietime assets.[6] Jack testified that he had fully depreciated only 1,000 tapes and subtracted the cost of those tapes, $ 45,000, from the cost of Movietime's entire library of tapes, $ 135,000, to arrive at the adjusted basis of $ 90,000 shown on petitioners' 1988 tax return. Petitioners provided no objective support for the adjusted basis of $ 90,000 claimed on the return, and we are satisfied that there could be no such support. They actually ignored their prior returns, on which the actual prior depreciation taken and allowed was $ 118,124, not $ 45,000, a discrepancy of more than $ 70,000. [7] When petitioners calculated their basis in the Movietime assets, they were negligent in ignoring the bulk of the *570 depreciation that they had previously deducted. *571 (b) Sec. 6661 -- Substantial Understatement
Respondent also determined an addition to tax under section 6661, which imposes an addition to tax equal to 25 percent of the underpayment attributable to a substantial understatement of tax. Pallottini v. Commissioner, 90 T.C. 498, 503 (1988). An understatement is substantial if it exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown on the return. Sec. 6661(b)(1)(A). An understatement is the excess of the amount of tax required to be shown on the return over the amount of the tax shown on the return, but an understatement will be reduced if the taxpayer either had substantial authority for, or adequately disclosed the facts affecting, the tax treatment shown on the return. Sec. 6661(b)(2). As with the negligence addition, even if section 267 or general principles of tax law requiring a bona fide sale did not disallow the entire loss, there would still be a substantial understatement because petitioners grossly overstated their adjusted basis in the Movietime assets. Petitioners did not include depreciation schedules, or cost figures, on their 1988 return. They did not *572 adequately disclose the facts necessary to substantiate their claimed losses from the disposition of the video store. Petitioners should have shown the amounts of their costs and depreciation allowed and how they determined their adjusted basis. As for substantial authority, petitioners had no authority for claiming an adjusted basis of $ 90,000 in Movietime. Petitioners calculated the basis with the crudest of accounting methods and with no authority from any source. If a taxpayer shows that there was reasonable cause for the understatement and that he acted in good faith, the Secretary may waive all or any part of the addition to tax under section 6661(a). Sec. 6661(c). The taxpayer ordinarily must prove that the Secretary abused his discretion by denying the waiver of the section 6661(a) addition to tax. Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988). The taxpayer is generally required to show (1) that he requested a waiver under section 6661(c), Klieger v. Commissioner, T.C. Memo. 1992-734, (2) that the Secretary refused the request, id., and (3) that reasonable cause and good faith are so clear that *573 the Secretary's refusal to waive the addition to tax was arbitrary, capricious, or without sound basis in fact, so as to amount to an abuse of discretion, Mailman v. Commissioner, supra at 1084. There is no evidence that petitioners ever requested a waiver. Petitioners did request a waiver in their brief, but that is too late, under Mailman v. Commissioner, supra. Even if petitioners had made a timely request (which respondent would have denied), they did not meet their burden of proving that they acted in good faith and had a reasonable cause for the understatement, so they cannot show that respondent's denial of their request would have been arbitrary, so as to amount to an abuse of discretion. To reflect the foregoing and the parties' concessions, Decision will be entered under Rule 155. Footnotes
1. After the record was closed, respondent moved to amend her answer to conform the pleadings to the proof to plead that the amount realized by petitioners should be increased by $ 9,520, the sum of the rental payments to have been made pursuant to the unexpired lease obligation. For the reasons summarized below, we denied the motion. There is no indication in the record that the lease obligation had any effect in determining petitioners' basis in the property. See sec. 1.1001-2(a)(3), Income Tax Regs. The Mezas' assumption of, or taking subject to, the obligation to make the future payments was not money received by petitioners, and there is no evidence in the record of the fair market value of the lease or whether it was a burdensome obligation. Nor does the transferees' oral assumption of the lease obligation equate with or contribute to an amount realized by petitioners. If the amount of the lease obligation was an amount realized, petitioners' basis in Movietime would have been increased by the same amount, resulting in a wash. Neither case cited by respondent in her motion papers, Brown v. Commissioner, 22 T.C. 147 (1954), affd. 220 F.2d 12 (7th Cir. 1955), and Fisher Cos. v. Commissioner, 84 T.C. 1319 (1985), affd. without published opinion 806 F.2d 263 (9th Cir. 1986), helped her cause. In any event, respondent, who would have had the burden of proof on this issue if we had granted her motion, seems to have overlooked that petitioners did have some basis in the Movietime assets that was in all likelihood greater than the amount realized on the transfer that respondent belatedly asserted that petitioners should be charged with. See infra↩ pp. 16-20.
2. Mrs. Meza's testimony was inconsistent with Jack's testimony and with her 1989 joint income tax return. Jack testified that the lease was terminated in May 1989, but Mrs. Meza testified that the lease ran to December 1989 and that she told the landlord she was closing the business and would make no more lease payments after May 1989. The Mezas' 1989 return shows videotape purchases and depreciation for Movietime through December 1989.↩
3. Respondent shows that the sec. 1250↩ gain ($ 5,352) was calculated by multiplying the excess depreciation ($ 13,380) by the applicable percentage (40 percent) and that the applicable percentage (40 percent) was calculated by subtracting the holding requirement (100 months) from 160 months and then subtracting the resulting amount (60) from 100 percent.
1. [($ 90,000 (depreciable basis) x 5 (no. of months of depreciation)) / 240 (total no. of months)] X 1.25 (percentage)↩
2. [(($ 90,000 - $ 2,344) X 12) / 240] X 1.25↩
3. [(($ 90,000 - $ 2,344 - $ 5,478) X 12) / 240] X 1.25↩
4. $ 90,000 X 90 months / 240 months↩
5. We note that the allowed or allowable amounts under the 125-percent declining balance method are lower than the straight-line amounts, and we attribute the discrepancy to computational errors by petitioners in computing depreciation claimed and allowed for the years 1983-88.↩
6. We find that petitioners' adjusted basis in Movietime at the time of transfer was, at most, $ 29,026, the amount that the Mezas carried over on their 1988 return. The Mezas' return provides detailed amounts, dates of purchase, and prior depreciation for all assets of Movietime. Petitioners have provided no evidence, other than self-serving testimony, that the adjusted basis in Movietime was any higher than the carryover amount.↩
7. Petitioners depreciated over $ 118,000 on their previous returns, but only accounted for $ 45,000 (1,000 x $ 45) of depreciation in arriving at their adjusted basis at the time of transfer. If petitioners invested only $ 135,000 (3,000 x $ 45), their adjusted basis in the tapes, according to previous returns, would have been $ 17,000 ($ 135,000 - $ 118,000). There is no evidence that the basis of all the other Movietime assets, i.e. shelves, etc., when added to the adjusted basis of the tapes could equal $ 90,000, or even the reduced deductible loss of $ 31,590.50 that petitioners argued for on brief.↩